COCA–COLA BOTTLING COMPANY OF MINNESOTA, Inc., a Minnesota corporation, Plaintiff,

v.

The COCA–COLA COMPANY, a Delaware corporation, Defendant.

Civ. A. No. 5269.

United States District Court
D. Minnesota,
Fourth Division.

Dec. 27, 1957.

---

Elwin E. Hadlick and Diessner, Wurst & Bundlie, Minneapolis, Minn., for plaintiff.

John D. Goodloe and Pope F. Brock, Atlanta, Ga., and David W. Raudenbush, St. Paul, Minn. (Morgan, Raudenbush, Morgan, Oehler & Davis, St. Paul, Minn., of counsel), for defendant.

NORDBYE, Chief Judge.

Plaintiff seeks a judgment of this Court declaring that it is entitled under its present bottling franchise with defendant to fill the so-called pre-mix container with the soft drink known as Coca-Cola and to vend the same in a pre-mix machine without further contractual authorization. The issues require a recital of some of the historical background and reference to the events and development of the Coca-Cola industry, as well as consideration of the terms of plaintiff's franchise.

In the year 1892, one Asa G. Candler was the sole owner of the secret process and method of making a syrup used in the preparation of the drink called Coca-Cola. In that year, Candler formally transferred the ownership of the process to The Coca-Cola Company, a Georgia corporation. At this time, the venture of bottling soft drinks was in its infancy, and Coca-Cola syrup was used mainly in a mixture of carbonated water at the conventional soda fountain. In 1899, practically all of the customers of The Coca-Cola Company were the soda fountain owners, with the exception of a few isolated concerns which were experimenting with the bottling of the soft drink. The Coca-Cola Company confined its business to the selling of the syrup to those who were in the soda fountain business and was not particularly interested in furthering the bottling end of the business. On July 21, 1899, The Coca-Cola Company entered into a contract with J. B. Whitehead and B. F. Thomas in which these parties obtained the exclusive bottling rights of Coca-Cola in the United States, except a few States not here material, and any doubts as to its perpetuity has been forever set at rest by appropriate recitals entered into thereafter by the necessary parties. The Candler company, however, retained the sole and exclusive right to sell the Coca-Cola syrup to the soda fountain trade. Whitehead and Thomas formed Coca-Cola Bottling Company, which corporate name was changed subsequently to Coca-Cola Bottling Company (Thomas) Inc., and assigned their contract with The Coca-Cola Company to that corporation. On April 20, 1900, Coca-Cola Bottling Company assigned part of its territory to Whitehead and Lupton, who formed a corporation in 1901 known as The Coca-Cola Bottling Company. On October 1, 1905, The Coca-Cola Bottling Company assigned its rights to Western Coca-Cola Bottling Company in certain designated

territories, including the State of Minnesota. In this contract, Western succeeded to all the rights of a bottler in its territory which had been conveyed by The Coca-Cola Company in 1899. On January 27, 1919, Western Coca-Cola Bottling Company granted a franchise to bottle Coca-Cola in certain counties in Minnesota to three individuals who in May, 1919, assigned these rights to Coca-Cola Bottling Company of Minnesota, Incorporated, the plaintiff in this action.

Defendant is a Delaware corporation, and it has purchased all the assets and assumed all the liabilities of The Coca-Cola Company, the Georgia corporation; hence, it has the same name as the original Candler company. The so-called bottling territory originally granted by The Coca-Cola Company was assigned and divided among six different companies. These six companies generally have been referred to as the parent bottlers, but for many years prior to this litigation, they had ceased their actual bottling activities and had limited their participation in the Coca-Cola industry to the buying of syrup from The Coca-Cola Company and reselling it to the actual bottlers. It appears that the defendant, as of this date, has purchased and liquidated all of the parent bottlers, including Western, except Coca-Cola Bottling Company (Thomas) Inc. The pertinent portions of the franchise under which plaintiff now operates, except as to the territory granted and provisions relating to price of the syrup, read as follows:

"That Whereas, Party of the first part has received from The Coca-Cola Company certain rights and privileges in regard to the bottling and selling of bottled Coca-Cola; and

"Whereas, Party of the first part wishes to convey to party of the second part the rights that it has received from The Coca-Cola Company, limited, however, to the following described territory, to-wit: Minneapolis & the Counties of Hennepin, Ramsey, Anoka, Dakota, Wright, Carver, Scott, Chicago, Isanti, Sherburne, Benton, Washington, Meeker, McLeod, Pine, Mille Lacs & Goodhue.

"And Whereas, Party of the second part is desirous of obtaining the right to bottle Coca-Cola in the territory hereinbefore described:

"Now, Therefore, For and in consideration of mutual benefits and promises from one to the other, and other valuable consideration, the receipt of which is hereby acknowledged, It Is Agreed:

"First: That the party of the first part hereby gives and conveys to party of the second part the right that it received from The Coca-Cola Company, to use the trade-mark name Coca-Cola, and all labels and designs pertaining thereto, in connection with the product 'Bottled Coca-Cola' in the territory hereinbefore described, and party of the first part agrees not to convey, assign or transfer the right of usage of said name in said territory to any other party whatsoever; and said party of the first part agrees to obtain and furnish to party of the second part, and only to obtain, for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of party of the second part in the territory herein described, provided party of the first part can obtain such syrup from The Coca-Cola Company. Nothing herein, however, shall give party of the second part any interest in the name Coca-Cola, labels, etc., except the right of usage in connection with Bottled Coca-Cola, nor shall this contract in any way interfere with the use of said name Coca-Cola, labels, etc., in connection with the fountain product of The Coca-Cola Company, it being understood and agreed, that the use herewith given shall be confined to the bottled product; the name, labels, etc., in connection with the fountain product having been reserved by The Coca-Cola Company.

"Second: Party of the first part does hereby select party of the second part as its sole and exclusive customer and licensee for the purpose of bottling and selling the Bottlers' Syrup Coca-Cola, in the territory herein described.

"Third: Party of the first part does hereby give to party of the second part

a license to use the distinctive Coca-Cola bottle adopted or to be adopted within the territory herein referred to, but said right shall end at such time as this contract is no longer in force or when it shall be terminated by the parties hereto or otherwise, provided, however, all conditions and terms of this contract are fully complied with by party of the second part.

"Fourth: * * * party of the second part agrees:

* * *

"(b) Not to sell Bottlers' Coca-Cola in syrup form, and not to bottle any Coca-Cola syrup that is made for fountain purposes.

"(c) To bottle Coca-Cola in the following manner. To have it thoroughly carbonated, put in bottles, using one ounce of Bottlers' Coca-Cola syrup in a standard Coca-Cola bottle, using a decorated crown stopper thereon, * * *.

"(d) To buy of or through said party all Coca-Cola syrup required or used by said second party in the preparation for market of its bottled goods aforesaid, and at the price of $1.25 per gallon delivered at any point in the above mentioned territory, where a bottling plant is established by party of the second part, the purchase price for said syrup to accompany any and all orders for same; or if cash does not accompany said order, then party of the first part is to have the right to draw on party of the second part, with bill of lading attached. For every gallon of syrup so purchased and so long as this contract and all stipulations herein are fully complied with, party of the second part shall be allowed in advertising, ten cents (10¢) per gallon; the advertising so allowed to be such as is carried by party of first part, or such as can be obtained by party of the first part from The Coca-Cola Company. All advertising bought in excess of the 10¢ gallon allowed, to be paid for in cash January 1st following.

"(e) To invest in a plant and equipment and to keep up said plant and equipment in such a condition as will be suffi-cient to meet satisfactorily the demands of the business in the territory herein referred to, and to increase such investment in said business as the demand for Coca-Cola in bottles in said territory may require.

"(f) To allow party of the first part to enter upon and examine the premises, where said Coca-Cola is bottled and prepared for market, and to allow party of the first part, or its agents to make any necessary examination, to see that the provisions of this contract are carried out fully.

"(g) Not to use the name Coca-Cola, nor bottle nor vend said product except in the territory herein referred to. This limitation, however, is not to prevent party of the second part from obtaining such rights from parties authorized to use the name Coca-Cola, and to bottle and vend said product.

"(h) To order, for the purpose of bottling Coca-Cola, the distinctive bottle, and none other, adopted or to be adopted by party of the first part; to use said distinctive bottle and none other, in bottling Coca-Cola, as soon as the present stock of bottles has been used and not to use said distinctive bottle for any other purpose than the bottling of Coca-Cola, and not in any territory except as herein referred to. The party of the first part agrees that the privilege of manufacturing this distinctive bottle will be granted to at least three reputable concerns, if a sufficient number of such firms remain in business, in order to secure for party of the second part a reasonable price for such bottles, and a prompt execution of its orders.

"(i) Party of the second part hereby agrees to use and purchase such crowns for the bottling of Coca-Cola as may be designated and approved by party of the first part. * * *"

For about half of a century, the drink known as Coca-Cola has been available for customers at soda fountains or as bottled Coca-Cola in the conventional glass bottles. The increasing innovations in the method of dispensing drinks

in the soft-drink industry apparently occasioned by the ever-mounting demands of the public for so-called soft drinks is manifested in the Coca-Cola industry in various ways. Extensive advances have been made in the adoption of uniformity in the designs of the bottle and in the uniform quality of the beverage. Advances in the art of refrigeration also have contributed to the dispensing of Coca-Cola in various types of machines located on premises where the drink is made available to Coca-Cola customers. In addition, there are now mechanical coin-operated machines which have markedly enhanced the opportunity of the bottler to dispense bottled Coca-Cola in greater quantities. And in a machine called a decapper, the bottle is not only decapped but is moved in the cabinet to the proper position where its contents are emptied into a suitable cup which likewise is automatically positioned to receive the drink. Apparently, however, there are certain objections to this method of vending bottled Coca-Cola, particularly with reference to the problem of the disposition of the emptied bottles, and in addition by reason of the limitations of space in the cabinet which is required for the storage of the bottles before and after being used.

Not only have advances been made in the so-called bottle trade, but similar changes are to be found in the soda fountain trade. There are now so-called post-mix machines at soda fountains which carbonate ordinary tap water and automatically inject the water and the required amount of Coca-Cola syrup into a paper cup available for the customer. Two large soft drink companies, Vernor Ginerale and Richardson Root Beer, have prepared a bulk pre-mix container for dispensing soft drinks at fountains. The Vernor Ginerale Company has operated in this manner since 1886, and for a short time during World War II it prepared pre-mix Coca-Cola in suitable tanks and dispensed it at picnics and other out-door gatherings. Plaintiff, however, emphasizes the so-called bifurcation of the Coca-Cola industry into the soda fountain and bottling end of the business. Separate names or symbols for the Coca-Cola syrup used at fountains and for the bottling plants have prevailed and have been insisted upon by the Coca-Cola Company. However, the syrup is of the same quality, whether used at the soda fountain or at the bottling plant. The soda fountain syrup is available to anyone, but the bottling syrup can be obtained only by a bottler holding a bottler's franchise.

Since about 1950, a new type of machine for the purpose of vending soft drinks of various kinds has appeared on the market, which is generally known as a pre-mix machine in that the soft drink is pre-mixed in a container and kept under refrigeration and carbonization so that, upon the insertion of a coin in the machine, a drink may be drawn. Neither The Coca-Cola Company nor any of the bottlers of Coca-Cola, claim any rights in and to these machines, and they are available not only for use in vending Coca-Cola, but for other soft drinks as well which are well-known in the market. These machines are manufactured by several companies. The container utilized for this bulk pre-mix beverage is constructed of light gauge stainless steel, and is approximately 9 inches in diameter and 21 inches in length, with a four-inch opening in the top fitted with a steel cap. The purpose of the opening is to facilitate the cleaning of the container. The container is filled and the drink is dispensed through fittings rather than through this top opening. Containers of a smaller size also are available, but the size indicated is the one commonly used in the dispensing of soft drinks. The container described is designed to hold 100 drinks, although pre-mix vending machines are manufactured to accommodate various numbers of these containers. The average machine holds five containers. In addition, there is a container of $CO_2$, which is used to aid the dispensing of the drink as it is drawn from the beverage container. This type of a machine is coin operated, and upon the insertion of the proper coin a cup of

the pre-mixed soft drink of the proper temperature is obtained.

In the preparation of such a pre-mix machine for the vending of Coca-Cola, the parties hereto are agreed that the bottler of Coca-Cola is best adapted and equipped to perform that operation. There are, however, certain differences for the assembly line operation between the filling of a conventional Coca-Cola bottle and a 100 drink steel container. But a drink of the same quality is produced in each operation. Since the decision in Coca-Cola Bottling Company v. Coca-Cola Company, D.C.D.Del.1920, 269 F. 796, and the amendments to the various bottlers' contracts which resulted from a settlement of the dispute in that case, there is no question as to the perpetuity and exclusiveness of the rights that plaintiff has received as a bottler of Coca-Cola in the territory assigned to it by Western. It is plaintiff's position, therefore, that, in light of its exclusive franchise as a bottler of Coca-Cola, it has the right under its contract to bottle Coca-Cola in the containers described and used in a so-called pre-mix machine, and to use the ordinary bottlers' syrup purchased from the defendant at the stipulated prices set forth in its contract in the preparation of the pre-mixed drinks. Defendant has proffered plaintiff a new contract which calls for a higher price for the Coca-Cola syrup to be used in a pre-mix container, although it does not deny that the syrup for pre-mix is substantially of the same character and quality as the syrup used in the bottling of Coca-Cola in the conventional bottle. In addition, the proffered contract for pre-mix is not perpetual.

In 1899, when the Coca-Cola Company granted the exclusive bottling rights for the territorial United States to J. B. Whitehead and B. F. Thomas, excepting therefrom the few States not here material, the principal method of dispensing soft drinks was at the soda fountain. As stated, the Coca-Cola Company was not interested in the infant industry of bottling soft drinks, which at that time had an indifferent beginning and future. The Coca-Cola Company, however, was not in the soda fountain business. It merely retained for itself the exclusive right to sell Coca-Cola syrup to that industry. In granting Whitehead and Thomas the exclusive right to buy Coca-Cola syrup for bottled Coca-Cola, plaintiff urges that the parties intended to divide the Coca-Cola industry between the soda fountain trade and the bottled trade, and that such division should be perpetually static. Therefore, plaintiff urges that Coca-Cola put up in any type of a closed container comes within the rights of its franchise as a bottler.

The difficulty, however, with plaintiff's position is that the terms of its franchise do not support its contentions in that regard. Moreover, a pre-mix machine is a concept of dispensing soft drinks never foreseen at the turn of the century by those who may have assumed to consider the Coca-Cola industry as one of two classes—the soda fountain and the bottling of Coca-Cola in bottles as that term was understood at the time that the original bottler's contract was issued to Whitehead and Thomas. And whatever the rights of the original bottlers may have been by reason of the so-called bifurcation of the industry, the rights of the plaintiff must necessarily be determined by the contract provisions it obtained from Western. Plaintiff's position, however, is that, upon an examination of the original grant from The Coca-Cola Company to Whitehead and Thomas, there is support for its contention that the parties in that early day had in mind a consumer's package of Coca-Cola other than the conventional glass bottle because in Paragraphs 3 and 10 * of that original contract, the following recitals appear:

"(3) Said parties of the first part further agree to prepare and put up

---

* The numbering of Paragraph 10 was changed to 13 by an undated amendment to the original contract shortly after its execution. Despite the change in numbering, the provision continued to be known as Paragraph 10.

in bottles or *other receptacles*, a carbonated drink containing a mixture of the Coca-Cola syrup and water charged with carbonic acid gas * * *.

"(13) Said party of the second part further agrees and hereby grants to said parties of the first part, the sole and exclusive right to use the name Coca-Cola and all the trademarks and designs for labels now owned and controlled by said party of the second part, upon any bottles or *other receptacles* containing the mixture heretofore described, and the right to vend such preparation or mixture bottled or put up *as aforesaid,* in all the territory contained in the boundaries of the United States of America, except the six New England states and the states of Mississippi and Texas. This right to use the name Coca-Cola and the trademark and label furnished is to be applied only to the carbonated mixture described, and is not intended to interfere in any way with the business and use of the same as now operated by the party of the second part, nor to apply to the soda fountain business as now operated by various parties." (Italics supplied.)

Plaintiff urges that the words "to put up in bottles or other receptacles, a carbonated drink containing a mixture of the Coca-Cola syrup and water charged with carbonic acid gas", as set forth in Paragraph 3 quoted above, and the reference in regard to the use of labels owned and controlled by Candler "upon any bottles or other receptacles" granted plaintiff's predecessor Western, connotes the broad right to bottle Coca-Cola, not only in the conventional glass bottle, but also in other receptacles of whatever description as well. That is, plaintiff assumes the position that this language indicates an intention of the original parties to the first bottler's contract that the bottler should not be limited in the bottling of Coca-Cola to the usual glass bottle or any type of bottle as such, but that the bottlers were granted the right to

bottle Coca-Cola in any type of receptacle which would be suitable and appropriate for the dispensing of this carbonated drink as a consumer's package. In view of the fact that Western originally obtained the same rights as Whitehead and Thomas, plaintiff contends that it succeeded to such rights when it obtained its franchise from Western. Plaintiff contends, therefore, that it has the exclusive and perpetual right in the territory allotted to it to prepare pre-mix Coca-Cola in any type of container which may be adapted for the dispensing of this beverage to the consumer trade. The record is clear that Western succeeded to all of the rights included in the 1899 contract in the territory assigned to it when it obtained its contract from The Coca-Cola Bottling Company. However, on April 24, 1915, Paragraph 10 of the 1899 contract was amended to read:

"For and in consideration of the agreement to sell and agreement to purchase, party of the second part does hereby give and convey to party of the first part the right to use the trademark name Coca-Cola, and all labels and designs pertaining thereto, in connection with the product bottled Coca-Cola, in the territory heretofore obtained by party of the first part, and agrees not to convey, assign, or transfer the right of usage of said name in said territory, to any other party whatsoever; and said party of the second part further agrees to only manufacture syrup for bottling purposes in sufficient quantities to meet the requirements of party of the first part, and of Coca-Cola Bottling Company, and for the requirements of the territory not conveyed by party of the second part to either of said companies. Nothing herein, however, shall give to party of the first part any interest in the name Coca-Cola, labels, etc., except the right of usage in connection with bottled Coca-Cola, nor shall this contract in any way interfere with the use of said name Coca-Cola, labels, etc.,

in connection with the fountain product of party of the second part; it being understood and agreed that the use herewith given shall be confined to the bottled product, the name, labels, etc., in connection with the fountain product to be used as party of the second part deems fit and advisable, in any and all territory. Party of the second part does hereby select party of the first part as its sole and exclusive customer and licensee for the purposes of bottling Coca-Cola in the territory heretofore acquired by said first party, and second party agrees not to sell its fountain syrup to anyone, when party of the second part knows that said syrup is to be used for bottling purposes."

Western likewise agreed to the amendment of its franchise in this respect. Apparently Paragraph 3 of the 1899 contract was not changed, but an analysis of the situation will indicate that the retention of the language of Paragraph 3 is of no particular significance herein. There is evidence that Paragraph 10 was changed in order to avoid a possible conflict with the Clayton Act, 15 U.S.C.A. § 12 et seq.

There is no evidence that any bottler holding a franchise from the Coca-Cola Company or its assigns ever used any receptacle for the bottling of Coca-Cola other than the conventional glass bottle. However, in recent years canned Coca-Cola has been made available for soldiers of the United States at official army canteens. It is not contended that this innovation in the dispensing of the drink is of any consequence herein. There is an absence of any showing here to indicate that in 1899 there was any container other than a bottle in which it was feasible or practical to put up Coca-Cola for the consumer trade. And, moreover, from all the circumstances it seems evident that glass bottles were the only type of receptacle for the bottling of Coca-Cola which was within the contemplation of the parties. At best, it would seem that the words "in other receptacles" were loosely used, without any expectation or intention that any additional rights of the bottlers were granted thereby. That this deduction is persuasive seems reasonable, not only from the history of the bottling of Coca-Cola as it existed at the turn of the century, but also by reason of the conduct of the parties thereafter.

In proceeding with the fulfillment of the original contract between the Coca-Cola Company and the Coca-Cola Bottling Company, in the years which followed, it appears that a total of 6,659 contracts or franchises were issued to parent bottlers and first-line bottlers after the original contract had been issued to Whitehead and Thomas. This number includes not only the contracts issued by the Coca-Cola Company in the States excepted from the territory originally granted to Whitehead and Thomas, but also the contracts which emanated from holders of the rights, including Western, which were originally obtained by Whitehead and Thomas. Out of the 6,659 contracts, only three contained the words "bottles or other receptacles" as this wording appears in Paragraph 3 of the 1899 contract. And only some 200 plus out of the 6,659 contracts issued contained the words "upon any bottles or other receptacles" corresponding to the language found in Paragraph 10 of the 1899 agreement. The three contracts which follow the language of Paragraph 3 of the 1899 contract have been superseded by new agreements in which this wording has been completely eliminated. And of the some 200 contracts which follow the language of Paragraph 10 of the 1899 agreement, all of them have been amended as of April 24, 1915, so that the phrase "upon any bottles or other receptacles", as originally stated, no longer appears therein. It is fair to conclude that the elimination of the language contained in Paragraphs 3 and 10 of the original contract, as hereinbefore set forth, was not carried out with any particular purpose or design to divest the bottlers of any rights that they had as

such. Indeed, it seems evident that no one ever had any thought that the bottlers' rights extended beyond the bottling of Coca-Cola in the generally accepted understanding of the word or term "bottle", and the reference to other receptacles was therefore deemed by the parent, first-line and sub-bottlers to be needless surplusage. Certainly, so far as the showing here indicates, no one ever advanced the suggestion before the advent of present pre-mix containers that the bottlers were clothed with any other rights than the bottling of Coca-Cola in the conventional glass bottle. The entire history of the industry indicates that, since the industry was launched, The Coca-Cola Company, and the bottlers as well, were attempting to work together for their mutual benefit in the marketing of bottled Coca-Cola in a standard glass bottle of a uniform style and design with a trademark inscription on the bottle and on the crown stopper. The entire purpose in this regard was to further the use of these indicia so that there would be a uniform symbol for bottled Coca-Cola wherever marketed. Consequently, if there was ever any substance to the contention that the bottlers of Coca-Cola had an unlimited right to use whatever receptacles might be deemed sufficient for the bottling of the beverage, that understanding now has been completely dispelled by the language adopted in the present franchises issued to bottlers. Obviously, the bottlers themselves, as well as The Coca-Cola Company which furnished the syrup, recognized long ago that if Coca-Cola was to be dispensed successfully in bottled form, there had to be supervision and control by the parent company as to the types of bottles to be used and as to the trademarks thereon. The very necessities of a successful marketing of a soft drink motivated the bottlers uniformily to accept the revision of the contract which now measures and controls the rights of the bottlers in this regard, including this plaintiff. In fact, the uniformity of the bottlers' contracts in this regard was one of the most important marketing innovations in this industry. The necessity of a distinctive bottle in which to market Coca-Cola on a nationwide scale was apparent to the defendant and to the bottlers as early as the year 1916. In that year, The Coca-Cola Company and the parent bottlers adopted the Root or Samuelson bottle as the standard Coca-Cola bottle. This was accomplished on July 6, 1916, by means of a contract between The Coca-Cola Company and the parent bottlers, including Western, on one hand, and the Root Glass Company, C. J. Root and Alexander Samuelson on the other. The reference to the distinctive Coca-Cola bottle in plaintiff's franchise arose from the adoption of the so-called Root bottle with its improvements thereafter adopted by the Coca-Cola Company and the parent bottlers. It is with this background that plaintiff's rights as a bottler must be determined and measured; that is, the rights of a bottler of Coca-Cola under a franchise in 1919, not in 1899.

Plaintiff emphasizes the language in the whereas clause in its contract with Western in which it is recited that Western, the party of the first part, "wishes to convey to the party of the second part the rights that it has received from the Coca-Cola Company." It is primarily with reference to this language that plaintiff assumes to predicate its broad bottling rights in the franchise provisions set forth in Paragraphs 3 and 10 of the original bottler's contract to which Western succeeded. However, the retention of Paragraph 3 in Western's contract, in view of the operative clauses of plaintiff's contract and in light of the history of the entire industry, affords plaintiff scant support for its contention that it obtained any rights as a bottler other than those set forth in the operative provisions of its contract with Western. There is no need to resort to the language of the whereas clauses when the body of the contract is plain and unambiguous as to the rights which plaintiff received. It is well established that recitals do not govern the operative provisions of a contract unless the operative provisions are ambiguous. Horn v. City

of Minneapolis, 182 Minn. 172, 237 N.W. 289; Wilson v. Towers, 4 Cir., 55 F.2d 199. Plaintiff's franchise from Western necessarily must be interpreted in light of the language used therein. The contention that Western granted to plaintiff certain rights which are broader than those to be found in the operative provisions of plaintiff's contract cannot be sustained. It seems clear that there is no need to resort to the whereas clauses, not only because the operative clauses are free from ambiguity, but also because of the widespread disuse and abandonment of the language contained in the original bottlers' contracts upon which plaintiff assumes to rely. If The Coca-Cola Company had permitted its bottlers to bottle Coca-Cola in bottles or containers lacking uniformity of design, the phenomenal success of bottled Coca-Cola never would have been achieved.

■ Plaintiff urges, however, that if it cannot rely upon the literal language of the early bottler's contract to which Western succeeded, the operative provisions of its contract with Western, fairly construed, are sufficient to grant to it the exclusive right to put up Coca-Cola in a pre-mix steel container. It asserts that, although the pre-mix container is not a conventional type bottle, it nevertheless conforms to the broad definition of a bottle. Reference is made to various dictionary definitions of the word "bottle". Webster's New International Dictionary, 2d Ed., defines a bottle as

"A hollow vessel of glass, earthenware, or the like, usually with a comparatively narrow neck or mouth, and without handles. Bottles of skins of animals, as of goats, sewn up in the form of a bag and tied at the neck, were used by the Hebrews, and are still in use, especially among the ruder peoples. *Bottle* is now so loosely used that its limit of application is not well defined: it is generally distinguished from such vessels as the jug and the demijohn."

Plaintiff also refers to the use in the bottled gas industry of huge metal containers which when filled are called bottled gas. But the various dictionary definitions of the word "bottle" are of no particular aid here. And to bottle gas in a steel container does not constitute the container a "bottle" except in a loose sense in the usage of the word. In plaintiff's franchise, the term "bottle" is used not in a broad sense, but in a most restrictive one. The bottle to which plaintiff is limited in its bottling of Coca-Cola is "a standard Coca-Cola Bottle, using a decorated crown stopper thereon." The franchise under which plaintiff operates requires that it use "the distinctive bottle, and none other, adopted or to be adopted." The crowns of the bottle are limited to those "designated and approved by the party of the first part [now The Coca-Cola Company]." That the language of plaintiff's franchise must be considered in light of the evident intention to confine the bottlers' franchises to the particular type of bottle adopted or to be adopted by The Coca-Cola Company, is further illustrated by the wording of Western's franchise granted in 1907 to bottling plants in Brainerd and Austin, Minnesota. The paragraphs numbered 2 in these contracts stated:

"The said party of the second part agrees to bottle Coca-Cola in the following manner: To prepare and put in bottles, using a crown stopper thereon, a mixture of Coca-Cola syrup and water charged with carbonic acid gas under a pressure of not less that one atmosphere, said Coca-Cola syrup and said water in said mixture to be used in proportions of not less that one ounce of Coca-Cola syrup to each seven or eight ounce bottle of carbonated water, making thereof a carbonated drink of the strength stated. And said second party also agrees not to use for said Coca-Cola syrup any substitute whatever in the preparation of the aforesaid carbonated drink or any other drink which may be put up by him and sold under the name of Coca-Cola. And he further agrees not to bottle any drink which

may be regarded by the party of the first part as a substitute for Coca-Cola. Said party also agrees not to sell or offer for sale any Coca-Cola syrup except in carbonated form."

At that time—1907—apparently any type of a bottle was available to the bottler of Coca-Cola as long as the proportions of Coca-Cola syrup and carbonated water were followed in the bottling process. The franchise to plaintiff, however, in 1919 by Western confined the bottling right to the plaintiff to the standard and distinctive bottle adopted or to be adopted by the defendant company.

The record here seems conclusive, first, that the steel container adapted for use in a pre-mix machine is not a bottle within the concept of the term "standard * * * bottle" as used in plaintiff's franchise; and second, that although The Coca-Cola Company has issued pre-mix bottling contracts, as proffered to plaintiff, to certain bottlers in other territories where Coca-Cola is put up in pre-mix containers by bottlers operating under the pre-mix contract in question, it cannot be said that defendant has adopted this steel container as a "bottle" within the terms of plaintiff's franchise. On the contrary, the undisputed fact is that defendant has refused to adopt the steel pre-mix container as a bottle within the meaning of any bottlers' franchise. Under its franchise, plaintiff would be without any authority to bottle Coca-Cola in any type of a bottle other than that which was adopted by the Coca-Cola Company. That plaintiff recognizes this construction of its franchise as being sound seems apparent from the recent steps taken by the defendant to promote the bottling of Coca-Cola in 10, 12 and 26 ounce bottles. Although these new type bottles have not been formally added as "adopted bottles" to plaintiff's contract,

plaintiff is permitted to utilize bottles of this size for the bottling of Coca-Cola by letter agreement between the parties, and no steps were taken by plaintiff to use bottles of this size for the bottling of Coca-Cola until express permission was granted by the defendant company. If, therefore, according to plaintiff's own interpretation, it cannot utilize a 16 ounce bottle without defendant's written consent, as a consumer's package for bottled Coca-Cola, it seems obvious that plaintiff cannot utilize a steel container for dispensing Coca-Cola in the absence of defendant's express consent.

█ This Court is not required to determine whether defendant may issue or grant a franchise to others to put up Coca-Cola in a pre-mix container and dispense the contents to the trade in a pre-mix machine in plaintiff's allotted territory without running afoul of an implied negative covenant which may be inferred or implied from plaintiff's franchise. Suffice it to say here that a reasonable and practical interpretation of plaintiff's bottler's contract requires a finding that the rights and privileges granted to it under the agreement of January 27, 1919, and the amendments thereto under which plaintiff now operates as a bottler of Coca-Cola in the territory assigned to it, do not include the right to fill with Coca-Cola a container for a pre-mix machine until defendant has, by some appropriate action in writing or otherwise, adopted the steel pre-mix container, or other type of a pre-mix container to be used in a pre-mix dispensing machine, as a "bottle" so as to be available for the bottling of Coca-Cola under plaintiff's present bottler's franchise.

Findings of fact and conclusions of law may be presented by the defendant upon ten days' notice. An exception is allowed.