**COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC., et al., Plaintiffs,**

**v.**

**The COCA–COLA COMPANY, Defendant.**

**Civ. A. No. 81–48 MMS.**

United States District Court, D. Delaware.

Feb. 18, 1987.

Edmund N. Carpenter II, Charles F. Richards, Jr., Jesse A. Finkelstein, of Richards, Layton & Finger, Wilmington, Del., of counsel: Emmet J. Bondurant, Jane V. Vehko, and Jeffrey D. Horst, of Bondurant, Mixson & Elmore, Atlanta, Ga., J. Barry Epperson, of Epperson, Goodpaster & Johnston, Tulsa, Okl., M.B. Jackson, of

MacDonald, Halsted & Laybourne, Los Angeles, Cal., for plaintiffs.

Andrew B. Kirkpatrick, Jr., William O. LaMotte, III, and Richard D. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., of counsel: Griffin B. Bell, Frank C. Jones, Chilton Davis Varner, and Dwight J. Davis, of King & Spalding, Atlanta, Ga., for defendant.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Three motions in this hard fought litigation are the subject of this opinion. Defendant, The Coca-Cola Company ("Company"), requests that the Court amend its decision in *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.*, 654 F.Supp. 1388 ("*Coke III*"), establishing the meaning of the terms "sugar" and "market price" in the 1921 Consent Decrees. Plaintiff bottlers filed two motions, the first for summary judgment on the first-line bottlers' standing to enforce the 1921 Consent Decrees, and the second requesting that the Court certify the *Coke III* decision as a final judgment under Federal Rule of Civil Procedure 54(b). For reasons detailed below, amendment of *Coke III* and the

Court's Order will be denied. Plaintiffs' motion for summary judgment on the standing issue will be granted with respect to certain bottlers and denied as to others. Plaintiffs' motion for Rule 54(b) certification will be denied. In order to understand the disposition of the motions, it is necessary to review pertinent aspects of this litigation odyssey.

## LITIGATION HISTORY

The roots of this case reach back to the 1921 Consent Decrees between the Company and its two parent bottlers, Coca-Cola Bottling Company ("Thomas Company") and The Coca-Cola Bottling Company ("Whitehead-Lupton Company").[1] The historical development of the Coca-Cola bottling and distribution system is detailed in the District Court's opinion issued prior to that case's settlement. *The Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. 796 (D.Del.1920). The 1921 Consent Decrees concluding the original litigation state that the contracts between the Company and the parent bottlers would be perpetual, and created a pricing mechanism for the sale of Coca-Cola syrup to the bottlers.[2] PX 4; PX 5. The Whitehead-Lupton and Thomas Companies were bought

---

1. The parent bottlers were J.B. Whitehead and B.F. Thomas and the companies to which they assigned their rights under a July 21, 1899, contract with The Coca-Cola Company. Except for the first two bottling plants which were built in 1899 in Chattanooga and Atlanta in 1900 (and which were sold shortly thereafter to actual bottlers), the parent bottlers did not own or operate any bottling plants or engage in the sale of bottled Coca-Cola. The parent bottlers subdivided their territories and assigned their rights under the 1899 Contract to other entities that actually bottled and sold Coca-Cola, which were known as "first-line bottlers" or "actual bottlers." For purposes of these motions, there were two principal parent bottling companies: Coca-Cola Bottling Company, owned by B.F. Thomas and commonly referred to as the Thomas Company; and The Coca-Cola Bottling Company, owned by J.B. Whitehead and J.T. Lupton and known as the Whitehead-Lupton Company. Each of the principal parent bottlers created and controlled two sub-parent bottler corporations prior to 1920 litigation which terminated with the 1921 Consent Decrees. Docket ("Dkt.") 334 at 50.

2. The relevant portions of the Consent Decrees are as follows:

 2. The present contract between the said parties described in the pleadings in the above entitled cause, as hereby expressly modified and changed, shall remain of full force and effect, and is hereby agreed to be perpetual, and the same shall apply to the parties hereto and their respective successors and assigns; but no assignment shall be made by the party of the first part without the consent of the party of the second part, as provided in the original contract.

 3. The said contract modified shall operate perpetually, but if abnormal or burdensome conditions prevail and the said parties fail to agree on a modification of prices and terms to meet such abnormal or burdensome conditions of occurrence and to continue during the same, then either party shall have the right to demand arbitration as to the price and terms; and if they disagree as to whether or not abnormal or burdensome conditions or occurrence exist, then that question shall also be arbitrated.

 4. No forfeiture of any kind shall ever take place under the said contract as hereby

amended until after the party of the first part shall have ninety (90) days written notice and opportunity to correct the conditions complained of, and if not corrected within said time and grounds of forfeiture exist, such forfeiture shall then occur; and if any forfeiture should ever arise as to any territory by reason of the act of any actual or sub-bottler, said forfeiture shall only apply to and embrace the territory supplied by the bottling plant of said offending actual or sub-bottler, and shall not extend to, nor cover, territory covered by the territory of any other bottler even though said territory was obtained from or through the offending bottler.

5. The parties hereto hereby raise the contract price of Coca-Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and a half cents ($1.17½) per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertising; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second part other than may arise under, and as provided for by the arbitration clauses herein.

6. In order to promote the sale of Coca-Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it at not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

7. It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

8. Whatever title, right or ownership, if any, party of the first party may have heretofore acquired, either under existing contracts between it and the party of the second part, or by virtue of its using and vending thereof, in the trade-mark, trade-name, labels, designs and patented designed bottles, as to bottled Coca-Cola, said party of the first part does hereby transfer and assign to the party of the second part; but it is agreed that the party of the second part hereby grants to the party of the first part, the sole and exclusive right and license to use and vend on bottled Coca-Cola the trade-mark, trade-name Coca-Cola and other Coca-Cola labels and designs, and to use the patented designed Coca-Cola bottles in the territory that may be forfeited under the provisions cf the contract as amended; coupled with an interest in said right to use and vend, which right and license is perpetual and irrevocable either by The Coca-Cola Company or its successors or assigns, or by any proceedings in insolvency of any character whatsoever, or by any trustee or receiver that may be appointed under insolvency or other proceedings against The Coca-Cola Company; and neither said The Coca-Cola Company nor its successors, assigns, receivers or trustees, nor purchaser from such receiver or trustee, shall have the right to use or vend said trade-mark, trade-name, labels, designs and patented designed bottles on or in connection with bottled Coca-Cola within such territory, nor permit or license anyone else to do so without the consent of Coca-Cola Bottling Company;

\* \* \* \* \* \*

10. The party of the second part [The Coca-Cola Company] contracts that the syrup sold and furnished by it to the party of the first part [the parent bottler] is to be high grade standard Bottlers Coca-Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

\* \* \* \* \* \*

12. Under no conditions shall the arbitration provided for herein reduce the price per gallon to be paid by the party of the first part to the party of the second part for Bottlers' Syrup, below the price hereinbefore specified, of one dollar and seventeen and a half cents ($1.17½) per gallon, including therein five cents (5¢) per gallon for advertising matter.

\* \* \* \* \* \*

15. This settlement is conditioned upon the consent of the actual bottlers to the modification of their contracts with the party of the first part in accordance with the terms of this agreement.

PX 4; PX 5.

out by the Company in 1934 and 1975, respectively, and the Company assumed all obligations to the actual or "first-line" bottlers.

In 1981, a group of "unamended" first-line bottlers brought suit against the Company for declaratory, injunctive, and monetary relief for breach of the 1921 Consent Decrees and enforcement of their Bottler's Contract.[3] The principal claims revolve about the Company's use of high fructose corn syrup ("HFCS-55"), and the syrup pricing formula that is drawn from the Consent Decrees and incorporated in the Bottler's Contracts. In August, 1982, this Court rejected the plaintiffs' motion to certify a class of unamended bottlers because plaintiffs "failed to demonstrate that there are common issues of law or fact ... [t]here are simply too many individual contract questions to be tried." *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.,* 95 F.R.D. 168, 178 (D.Del. 1982) (*"Coke I"*).

Plaintiffs subsequently filed motions requesting, *inter alia,* reconsideration of the denial of a class certification, and leave to intervene in the original 1920 cases between the company and the parent bottlers to permit enforcement of the Consent Decrees. The Court granted limited class certification and severed two class issues for separate trial: the meaning of the terms "sugar" and "market price" in the 1921 Consent Decrees. *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.,* 98 F.R.D. 254, 282 (D.Del.1983) (*"Coke II"*). The petitions for intervention in the 1920 cases were denied.[4] *Id.*

After 16 days of trial, generating over 3400 pages of transcript, the Court ruled

on the meaning of the terms "sugar" and "market price" in the Consent Decrees. *Coke III,* 654 F.Supp. at 1391. Resolution of those questions "did not include consideration of issues and defenses peculiar to individual bottlers nor construction of the actual bottlers' contracts." *Id.* at 1391 n. 4. Plaintiffs and defendant then each filed the post-trial motions presently under consideration.

## I. MOTION TO AMEND FINDINGS

Defendant moves the Court amend its findings and judgment entered on August 8, 1986. The 75-page slip opinion dealt with what movant has described as "an extraordinarily complex and complicated set of facts," most if not all of which were meticulously annotated to the records. Because that opinion contains all of the salient facts and the Court's basis for its finding of fact, legal theory, and conclusions of law, they will not be repeated.

The *Coke III* opinion defined "market price" as used in Paragraph 7 of 1921 Consent Decrees and determined the meaning of sugar as used in Paragraph 10. The latter determination entailed analyzing whether the term sugar in Paragraph 10 encompassed high fructose corn syrup ("HFCS-55"). The Court held that "the 'market price' of sugar in Paragraph 7 means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less

---

**3.** In 1979, the Company began negotiations with its bottlers to amend the Bottler's Contract to substitute a new syrup composition and a pricing formula based on a "sugar element," a "base element," and the Consumer Price Index. *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. The Coca-Cola Co.,* 95 F.R.D. 168, 173 (D.Del.1982) (*"Coke I"*). a majority of the bottlers amended their contracts. Those who have not accepted the amendment (unamended bottlers) continue to operate under contracts conforming to the 1921 Consent Decrees. *Id.* at 172–73.

**4.** In addition, immediately prior to trial on the two class issues, the Court denied plaintiffs' request to admit into evidence the opinions and transcripts from *United States v. Sugar Institute, Inc.,* 15 F.Supp. 817 (S.D.N.Y.1934), *aff'd,* 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936). *Coca-Cola Bottling Co. of Elizabethtown v. The Coca-Cola Co.,* Civ. A. No. 81–48 MMS (D.Del. May 19, 1986) (unpublished opinion) [Available on WESTLAW, DCTU database].

any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances, or rebates." I also held that the meaning of the term "sugar" as employed in Paragraph 10 means refined granulated sugar from cane or beet sugar and that HFCS–55 is not sugar for purposes of Paragraph 10. *Coke III,* 654 F.Supp. at 1391.

The Company takes issue with both conclusions. While its motion is styled as one to amend findings and alter the judgment, the reality is that with respect to market price, it seeks to have its definition adopted *in toto.* With regard to the meaning of sugar and HFCS–55, it seeks to convert defeat into victory.

On the issue of market price, defendant is unhappy with the conclusion that market price includes "discounts, allowances or rebates ... which are available ... or made known to [industrial users] upon inquiry prior to sale." The Company contends as it did at trial that the "discounts, allowances or rebates to be used in calculating 'market price' are only those which are openly announced by a refiner and available to all purchasers." Dkt. 378 at 12.

■ While plaintiff assaults the Court's findings on "market price" on several fronts, only those discussed below merit discussion. First, defendant asserts there is no factual support for the Court's definition of the term. It recommends that the formulation be amended or clarified so as to adopt *defendant's* definition in its entirety. According to the defendant, if the Court does not alter its finding, there will be litigation over implementation of the definition. Moreover, defendant urges that plaintiffs are pursuing a theory of market price never propounded by them prior to the outcome of the trial. The short answer is that ample evidence, annotated to the record as set forth in the *Coke III* opinion, supports the Court's conclusion.

At best, defendant wishes the Court to view that evidence differently, a battle it lost at trial. With regard to the "market price" definition possibly leading to litigation and not being in full accord with the position of either litigant, the Court cannot be concerned. Its chore was to define a term as used in the 1921 Consent Decrees, based upon the entire record, not simply to chose the litigation position of one of the parties. In like vein, speculation that the definition drawn from all the evidence will lead to additional litigation cannot be permitted to corrupt a well-documented finding of the parties' intent.

■ Second, defendant argues certain findings of the Court are unsupported by the evidence and go beyond the issues certified for trial. The Company's assertion is directed primarily at what it considers to be adverse factual findings along the spectrum of performance during the sixty plus years of operation under the Consent Decrees. Defendant's contentions as to course of performance were litigated during trial. Notwithstanding its assertions, the findings were annotated to and supported by the record, and nothing defendant has presented persuades the Court that the findings should be changed.

Defendant aggressively argues that one particular finding relating to course of performance is especially egregious, being both unsupported by the evidence and going beyond the issues certified for trial. Defendant objects to the Court's finding that during the long course of performance under the Consent Decrees there was, in 1969, "an abrupt change in policy [that] deviates from the Consent Decree." *Coke III,* 654 F.Supp. at 1417. The support for this conclusion is set out in the opinion and refutes defendant's argument that it is unsupported by the record.

Both parties knew prior to trial that course of performance evidence, drawn from years of operating under the Consent Decrees, would play an important role at trial. Indeed, much of the proffered evidence during trial went directly to that issue. Controlling case law dictates that it

is not only appropriate, but absolutely necessary for the Court to make findings with respect to that course of performance.

■ The subsidiary finding with respect to course of performance since 1969 was one of many relating to course of performance from 1921 to the present. This evidence, in turn, is but one indicia of the intent of the parties which led to the Court's resolution of the meaning of "market price" as used in the 1921 Consent Decrees. It follows that because it was encompassed within the course of performance finding, the complained of finding was well within the scope of the certified issues.

■ Defendant fears the finding will have some unknown preclusive effect at a later stage in these proceedings. When queried, defendant was unable to state where and how it would be precluded. Transcript of Nov. 17, 1986 Hearing ("Transcript"), Dkt. 391, at 11–15. It is true the Company will not be able to urge for 1969 and subsequent years that there were no violations because the information it used was in conformity with the Consent Decrees unless (1) it followed the definition of market price and/or (2) there were no lower prices available upon inquiry in conformance with the Court's definition of market price. The burden remains upon plaintiffs, however, to establish the Company deviated from "market price" as defined. Failure to meet this burden for each of the quarters involved will result in no damages for any quarter in which there is a deficiency of proof. Similarly, subject to being convinced otherwise, the burden of proving prices available upon inquiry remains with plaintiffs. As a consequence, an untoward preclusive effect is difficult to visualize, but if it should materialize, it can be addressed at that time.

■ Finally, the Company finds unpalatable the Court's conclusion that the bottlers waived their right under the Consent Decrees to object to the defendant's use of beet sugar. The Company introduced course of performance evidence that the bottlers did not object to the use of beet sugar commencing in 1941. It then urged

that the bottlers' failure to object to the use of beet sugar meant that sugar as used in Paragraph 10 was a generic term that included not only beet sugar but HFCS-55. The Court not only rejected the inference desired by defendant but also the inference desired by that of plaintiff, viz., the bottlers did not object because they understood sugar as used in Paragraph 10 encompassed beet as well as cane. Instead, the Court found that the term "sugar" in Paragraph 10 was originally intended in 1921 to be limited to cane sugar, and that 20 years later, bottlers waived their right to object to beet sugar when they failed to object to its introduction beginning in 1941. Having rejected competing inferences and unencumbered by an advocate's zeal, the Court drew its own conclusion.

Defendant argues that the Court's finding of waiver falls outside the scope of the issues certified for separate trial because it is not course of performance evidence. The Company misapprehends the basis on which this conclusion was reached. As one commentator has noted, "It is sometimes difficult to draw the line between conduct that is the basis for a course of performance, on the one hand, and conduct that is the basis for waiver...." E. Farnsworth, *Contracts* at 514–515 (1982).

Course of performance evidence is not only an aid to interpreting a contract's terms, but aids in demonstrating whether a party knowingly waived a right under a contract during the course of its performance. The Uniform Commercial Code recognizes that "course of performance shall be relevant to show a waiver or modification of any term inconsistent with such performance." 6 *Del.C.* § 2–208(3). Although the Uniform Commercial Code does not govern the interpretation at issue, it illustrates the fact that waiver is not wholly distinct from course of performance. In concluding that the bottlers waived their right to object to the use of beet sugar in 1941, the Court applied the evidence to determine the effect of the bottlers' act. *See Coca-Cola Co. v. Nehi Corp.*, 27 Del.Ch. 318, 36 A.2d 156, 164–65 (1944)

(parties' course of performance after entry of consent decree considered in determining scope of restriction under decree). The finding of waiver is the logical conclusion drawn from the parties' actions.

■ Moreover, even without waiver, the Court's conclusion on course of performance would not be altered. The linchpin of the Company's course of performance argument is that the bottlers, by accepting beet sugar without objection in 1941, transformed "sugar" as used in Paragraph 10 into a generic term.[5] The Company argues that under its theory, "sugar" was transformed from a specific term to one broad enough to encompass HFCS–55.

The weakness in the Company's position is that course of performance itself requires assent of both parties. *Restatement (Second) of Contracts* § 202. The Company in 1941 began using beet sugar and the bottlers acquiesced without objection. In contrast, when the Company started using HFCS–55 derived from a family of complex carbohydrates, the bottlers immediately made known their objection to the use of anything but sucrose. Given that during the sixty plus years of course of performance there was assent to beet sugar, but objection to HFCS–55, course of performance unequivocally demonstrates that HFCS–55, not derived from cane or beet, is not "sugar" within the meaning of Paragraph 10 of the Consent Decree.

Given these circumstances, defendant's complaints that the findings were not supported by the evidence and exceeded the scope of the issues certified for trial are devoid of merit. In summary, defendant's charges that certain findings were not supported by the evidence are belied by the annotations to the record contained within the *Coke II* opinion. At best, the Company's complaint is that its view of some of the evidence and the inferences to be drawn from it were not adopted.

In each area where the Company asserts the Court exceeded the scope of the certified issues, the Court's findings were responsive to issues raised and arguments made by the Company. They do not exceed the scope of the certified questions simply because the determinations are adverse to the Company.

An order will be entered denying defendant's motion to alter or amend the Court's findings.

## II. STANDING

Plaintiffs' motion for partial summary judgment puts in issue whether each of the unamended bottlers has standing to enforce the terms of the 1921 Consent Decrees. The Court considered this issue initially in *Coke I*, stating that it had "serious reservations regarding the standing of [unamended bottlers] to assert rights under the 1921 judgments." 95 F.R.D. at 175. The question arose in the context of plaintiffs' petition to certify a class action, specifically whether there was sufficient commonality of interest under Federal Rule of Civil Procedure 23(a)(2). Based on a Supreme Court statement that "a consent decree is not enforceable ... directly or in a collateral by those who are not parties to it ...," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975), this Court held for purposes of third party standing to enforce consent decrees "the connection to the original litigation is simply too tenuous to permit [unamended bottlers] to enforce the judgments...." *Id.* at 177.

Upon plaintiffs' motion to reconsider, the Court determined it "need not have decided these [standing] issues in that they were not necessary for a determination of the class certification motion." *Coke II*, 98 F.R.D. at 264. The Court went on to hold that the question would be held in abeyance until its resolution was "necessary for the proper adjudication of this case." *Id.*

The decision in *Coke III*, determining the meaning of "sugar" and "market price" as

---

**5.** Specifically, defendant urges the term sugar, as used in Paragraph 10, includes sugar from a source other than cane. Therefore, HFCS–55, like beet, was cheaper than cane, and because of the use of liquid sucrose from cane or beet, sugar could be in liquid form like HFCS–55.

used in the Consent Decrees, has terminated the class action aspects of the litigation. The standing question must now be resolved.

The analysis will begin by reviewing the status of the first-line bottlers with regard to the original cases involving the Company and the Thomas and Whitehead-Lupton Companies, and the relationship between the parent bottlers and the first-line bottlers. The Court will then consider the numerous arguments plaintiffs propose will grant standing to enforce the Consent Decrees.

### A. *Standing Background*

B.F. Thomas and J.B. Whitehead formed The Coca-Cola Bottling Company in 1899, when they obtained exclusive rights to bottle Coca-Cola, purchase syrup at a fixed price and use the Company's trademarks. *Coke I,* 95 F.R.D. at 171. The company divided into two parts in 1900, the Thomas Company and the Whitehead-Lupton Company, each with a specified exclusive sales territory. These two parents did not bottle Coca-Cola themselves, instead contracting with first-line bottlers who owned and operated the actual plants. *Id.* "The parent bottlers assigned to the actual bottlers all rights to purchase Coca-Cola syrup and to bottle and sell Coca-Cola in a given territory." *Id.*

A bitter dispute arose over escalating syrup prices due to post-World War I inflation in the sugar market. The Company informed the parent bottlers that their contracts were "at will" and could be terminated at any time. *Id.* at 172. The parents responded by filing suit in the United States District Court for the District of Delaware on June 1, 1920, requesting a preliminary injunction barring the Company from terminating the contracts. *Id.*

On June 9, 1920, six first-line bottlers from the Whitehead-Lupton Company territory filed a petition to intervene aligned with the plaintiff in *The Coca-Cola Bottling Co. v. The Coca-Cola Co.,* Civ.A. No. 389 (D.Del.1920). There were no proposed intervenors in the Thomas Company suit, *Coca-Cola Bottling Co. v. The Coca-Cola Co.,* Civ.A. No. 388 (D.Del.1920). The District Court granted the motion to intervene. *The Coca-Cola Bottling Co. v. The Coca-Cola Co.,* 269 F. 796, 815 (D.Del.1920); *see Coke II,* 98 F.R.D. at 259. In June, 1920, when suit was filed, there were approximately 500 bottlers in the Whitehead-Lupton territories and over 300 Thomas bottlers. *Coke I,* 95 F.R.D. at 176. The Whitehead-Lupton bottlers' intervention was financed by the Coca-Cola Bottlers Association, which appointed a Special Committee consisting of six Whitehead-Lupton bottlers and five Thomas bottlers to oversee the litigation on the bottlers behalf. *Id.*

The District Court ruled in favor of the plaintiff and intervenors, granting a preliminary injunction and holding that the contracts between the Company and the parent bottlers were perpetual. 269 F. at 816. During the pendency of an appeal, the parties signed separate settlement agreements on June 21, 1921. *Coke I,* 95 F.R.D. at 172. The first-line bottlers that intervened in the Whitehead-Lupton Company suit did not sign the settlement agreement but did sign the Consent Decree which incorporated the settlement agreements in the Consent judgments. *Coke II,* 98 F.R.D. at 259 n. 11.[6]

### B. *Standing Analysis*

Plaintiffs present a number of arguments to support their position that the unamended first-line bottlers, who were not parties to the 1921 Consent Decree signed by the Company and the parent bottlers,

---

**6.** The Whitehead-Lupton Company's settlement was conditioned on its actual bottlers' agreements to accept modifications to their contracts so that the contracts, which were already perpetual, would conform to the consent order. It sent out a standard form amendment to its bottlers. The Thomas Company's bottlers had two-year term contracts which for the most part had expired during the course of the litigation. Between August and November of 1921, the Thomas Company entered into new form perpetual contracts with its bottlers which conformed to the consent order. *Coke I,* 95 F.R.D. at 173.

may nevertheless bring suit to enforce the terms of that Consent Decree. The major premise of their arguments is that "plaintiff bottlers have standing to enforce the 1921 Consent Decrees to the same extent as they would have been able to enforce a final judgment on the merits against The Coca-Cola Company under established principles of *res judicata* and collateral estoppel." Dkt. 379, at 32. Plaintiffs fail, however, to adequately address the governing principle in suits for violation of a consent decree stated by the Supreme Court in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) (*"Blue Chip"*):

> ... a well-settled line of authority from this Court establishes that a consent decree is not enforceable directly or in collateral proceeding by those who are not parties to it even though they were intended to be benefited by it. *United States v. Armour & Co.,* 402 U.S. 673 [91 S.Ct. 1752, 29 L.Ed.2d 256] (1971); *Buckeye Co. v. Hocking Valley Co.,* 269 U.S. 42 [46 S.Ct. 61, 70 L.Ed. 155] (1925).

(footnote omitted).

■■■ Plaintiffs' premise is flawed because they have misapplied the principles of collateral estoppel and *res judicata* to the issue of standing. "[C]oncepts of claim preclusion do not apply directly to efforts to secure supplemental relief in the original action, or to efforts to secure direct relief from the judgment in the original action." C. Wright, A. Miller, & E. Cooper, 18 *Federal Practice & Procedure* § 4406 (footnotes omitted). *Res judicata* and collateral estoppel are fundamentally concerned with protecting persons from the expense of multiple lawsuits, conserving judicial resources, and enhancing reliance on judicial acts by immunizing against the possibility of inconsistent decisions. *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 973–74, 59 L.Ed.2d 210 (1979) (footnotes omitted). The doctrines are designed to limit *subsequent* relitigation of issues or claims which were fully and fairly decided previously. Standing, on the other hand, is a question of whether a person in the present context has the substantive right to enforce a consent decree directly or in a collateral proceeding. *See Blue Chip,* 421 U.S. at 750, 95 S.Ct. at 1932.

The doctrines are not entirely distinct, and substantial overlap exists. For example, a party to a consent decree would be barred by *res judicata* from bringing a new claim arising from the transaction covered by the consent decree. That party would also have standing to sue the other party to the consent decree if the latter were to violate its terms. In this associative circumstance, standing and *res judicata* are coextensive. Principles of claim and issue preclusion can help identify who the parties were in the first litigation. The doctrines, however, focus on two different stages of litigation: standing, in this context, identifies the parties to the original litigation; *res judicata* and collateral estoppel address prudential barriers to claims or issues in subsequent litigation where, *inter alia,* one party may not have been involved in the original litigation.

In order to determine whether the first-line bottlers have standing to sue, the Court must analyze who were the *parties* to the 1921 Consent Decree, *Blue Chip,* not whether the bottlers or the Company are bound by the Consent Decree in subsequent litigation under principles of *res judicata* and collateral estoppel.

**1. Party Status of Unamended First-Line Bottlers**

The status of the first-line bottlers in the original litigation and the terms of the 1921 Consent Decrees must be analyzed to determine which, if any, of the bottlers is a "party" with standing to enforce the Decrees.

**a. Shreveport Intervention**

■■■ Among the first-line bottlers intervening in *The Coca-Cola Bottling Co. v. The Coca-Cola Co.,* Civ.A. No. 389 (D.Del. 1920), was Star Bottling Works, Ltd., which is now the Coca-Cola Bottling Company of Shreveport, Inc. ("Shreveport"), an unamended bottler in the present litigation. *Coke II,* 98 F.R.D. at 258. Shreveport is

within the former Whitehead-Lupton territory, and at the time of the litigation it had a perpetual contract with the Whitehead-Lupton Company. *Id.* at 257–58 & n. 3; *Coke I*, 95 F.R.D. at 171.

As a party to the original litigation, Shreveport signed the Final Decree entered by the District Court dismissing the case. PX 5. The Settlement Agreement signed by the Whitehead-Lupton Company and the Company on July 6, 1921, was attached to the Consent Decree as "Exhibit 1." [7] The intervenors approved the Settlement Agreement as the basis for dismissing the case, and therefore are parties to that agreement. Shreveport's status as a party meets the strict requirement of *Blue Chip*, permitting it to enforce the Consent Decree. Defendant argues, however, that under former Equity Rule 37, which governed intervention in the litigation at that time, Shreveport was not accorded the status of a party to the Consent Decree, and therefore does not have standing.

Equity Rule 37, in pertinent part, stated: "Anyone claiming an interest in the litigation may at any time be permitted to assert his right by intervention, but the intervention shall be in *subordination* to, and in recognition of, the propriety of the main proceeding." Rules of Practice for the Courts of Equity of the United States, 226 U.S. 627, 659 (1912) ("Equity Rules") (Emphasis added).[8] Defendant argues that Shreveport's subordinated status prohibited it from attacking any orders arising from the main litigation between the Company and the parent bottlers.

An intervening party under Equity Rule 37 was not allowed to enter the proceeding "in defiance" to the primary suit. *Whittaker v. Brictson Mfg. Co.*, 43 F.2d 485, 491 (8th Cir.1930). In *Whittaker*, the Circuit Court reluctantly denied the intervenor's motion to vacate a default judgment on the ground that a subordinated party could not set aside the entire proceeding between the main parties. *Id.; see Adler v. Seaman*, 266 F. 828, 841 (8th Cir.1920), *cert. denied*, 254 U.S. 655, 41 S.Ct. 218, 65 L.Ed. 460 (1921) (subordination rule bars intervenor from attacking court's jurisdiction); *King v. Barr*, 262 F. 56, 59 (9th Cir.), *cert. denied*, 253 U.S. 484, 40 S.Ct. 481, 64 L.Ed. 1025 (1920) (same). "The rule of subordination probably was designed to preclude an intervenor from raising frivolous issues, attacking administrative orders already made, interfering with the general control of the litigation, and unduly delaying such litigation." J. Moore, 3B *Moore's Federal Practice* ¶ 24.-04, at 24–25. *See* Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Geo. L.J. 551, 570 (1937) (same).

Shreveport's intervention in the case had a twofold purpose: to support the parent bottlers' claim that the contracts with the Company were perpetual, and, if that position failed, that the first-line bottlers had an independent right to receive Coca-Cola syrup on the basis of their perpetual con-

---

7. The Final Decree entered by the Court states:

It appearing to the Court that the above stated cause is now ripe for final decree; that the parties thereto, including all of the Intervenors actually intervening in said cause, have entered into an agreement settling and compromising said case and all questions of difference thereon arising, an original signed copy of which contract has been exhibited to the Court and a true and correct copy of which is hereto attached as Exhibit 1, and Counsel representing the several parties to said cause moving the Court to make said agreement of compromise and settlement the decree of the Court in said cause, and all parties in open court consenting thereto,

IT IS ORDERED, ADJUDGED AND DE-CREED: That said agreement or settlement and compromise, as the same appears attached here-to as Exhibit 1, be and the same is made the decree of this Court; and that it is so accordingly adjudged and decreed by the Court.

That all previous orders in this case are revoked.

That all costs in the cause not heretofore paid are taxed equally against the Plaintiff and the Defendant, one-half to each.

In open Court, this 4th day of October 1921.
/s/Hugh M. Morris
Judge U.S. District Court.
We consent to the foregoing decree:
[Signed by all intervenors]

8. Federal Rule of Civil Procedure 24 replaced, *inter alia*, Equity Rule 37, dispensing with the subordination requirement. *See* J. Moore 3B *Moore's Federal Practice* § 24.04.

tracts with the parent. PX 1, VI Transcript of Record in Case No. 2651 ("Record"), at 86–87, 89–90. The intervenors asserted in support of their motion that they were induced into contracting with the parent bottlers on the basis of the perpetual contracts between the main parties. *Id.* at 87. Shreveport's position is, therefore, in part essentially derivative of the Whitehead-Lupton Company's position in the litigation.

Subordination under Equity Rule 37 limited the intervenor's power to present certain issues to the court, but did not otherwise affect the right of the intervenor to participate in the litigation. Shreveport's petition for intervention demonstrated that it was a party to the litigation with an interest coextensive to the Whitehead-Lupton Company's regarding the perpetual nature of the contract.

The Consent Decrees guarantee the perpetual term of the contract between the Company and the parent bottlers, which was one of the interests the intervenors sought to advance. As a party to the case and signatory of the final decree incorporating the terms of the principal parties' agreement. Shreveport has standing to enforce the terms of the Consent Decree against the Company under *Blue Chip.*

### b. Class Representation

In the intervention petition, the Whitehead-Lupton first-line bottlers state that their petition was

> for the use and benefit of themselves and of various other corporations, firms and individuals throughout the United States operating under contracts similar to those under which the petitioners are

operating as hereinafter fully stated and engaged in bottling and selling bottled Coca-Cola; said individuals, firms and corporations numbering all together some five hundred separate organizations

> . . . .

VI Record at 81. The intervenors alleged in Count II of their petition that

> In addition to the petitioners whose names have been hereinbefore set forth there are ... other persons, firms and corporations operating under contracts with the complainant [Whitehead-Lupton Company] herein similar to those under which petitioners are operating to the total number of more than five hundred.

*Id.* at 85.

The plaintiffs argue that the class status of the intervention applied to *all* first-line bottlers, while the defendant asserts that the absence of any formal petition under former Equity Rule 38 for certification of a class action bars all but the original intervenors from being considered parties to the litigation. The nature and scope of the class intervention must be ascertained to determine which bottlers were parties to the original litigation and, therefore, parties to the Consent Decree.

### i. *Whitehead-Lupton Bottlers*

The six first-line bottlers [9] that intervened in the case all had contracts with the Whitehead-Lupton Company. The bottler contracts were perpetual assignments of rights from the parent made with the Company's consent. PX 20 ¶ 6. The intervention on behalf of the other Whitehead-Lupton bottlers [10] came under Equity Rule

---

**9.** Star Bottling Works, Ltd. (Louisiana), Augusta Coca-Cola Bottling Co. (Georgia), Spartanburg Coca-Cola Bottling Co. (South Carolina), Alabama Coca-Cola Bottling Co., Birmingham Coca-Cola Bottling Co. (Alabama), and Waynesboro Coca-Cola Bottling Co. (Georgia).

**10.** The unamended first-line bottlers operating in the former Whitehead-Lupton territory at the time of the 1920 litigation who have intervened in the current litigation are: Coca-Cola Bottling Co. of Tulsa; The Coca-Cola Bottling Co. of Fort Smith; Ouachita Coca-Cola Bottling Co.; Coca-

Cola Bottling Co. (Texarkana); Wichita Coca-Cola Bottling Co. PX 42, 61, 63, 80, 83.

The following bottlers in the former Whitehead-Lupton territory intervening in the current litigation did not exist, and are not successors or assigns of previously existing first-line bottlers, at the time of the 1920 litigation: The Coca-Cola Bottling of Tuscon, Inc.; Natchez Coca-Cola Bottling Co., Inc.; Streator Coca-Cola Co.; Jefferson City Coca-Cola Bottling Co.; Trenton Coca-Cola Bottling Co.; Coca-Cola Bottling Co. of Brownsville, TX. These plaintiffs signed bottler contracts directly with the Company,

38: "When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole." Equity Rules, 226 U.S. at 659.

■ The defendant argues that the District Court never "certified" a class action on behalf of the Whitehead-Lupton bottlers. The argument fails because Equity Rule 38 did not contain a mechanism for determining whether a class exists, as Federal Rule of Civil Procedure 23 does today. Instead, the determination of class representation was left to the court's discretion. In the District Court's opinion issued prior to settlement, Judge Morris denied the Company's objection to the intervention. *The Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. at 815 (citing *Osborne v. Wisconsin Cent. R. Co.*, 43 F. 824, 827 (C.C.W.D.Wisc.1890) (Harlan, J., Circuit Justice); *Prentice v. Duluth Storage & Forwarding Co.*, 58 F. 437, 441 (8th Cir. 1893)). In permitting intervention, the Court stated, "... all persons having an interest in the subject of the action and in obtaining the relief demanded are now before the court." 269 F. at 815.

■ The Company further argues that, even if the intervention was on behalf of a class of bottlers, the class action was "spurious," and only the intervening bottlers

may properly be denominated as parties to the 1921 litigation. The issue turns on the proper characterization of the non-intervening bottlers' status under former Equity Rule 38 and requires a brief excursion into the Rule's derivation.

Equity Rule 48, the predecessor to Equity Rule 38, permitted class suits, but limited the effect of judgment by stating that "the decree shall be without prejudice to the rights and claims of all the absent parties." [11] 42 U.S. (1 How.) Lvi (1843), *reprinted in* Hopkins, *New Federal Equity Rules* at 52 (5th Ed. 1925). The Supreme Court ignored the Rule's limitation in *Smith v. Swormstedt*, 57 U.S. (16 How.) 228, 14 L.Ed. 942 (1853), holding, "For convenience, therefore, and to prevent a failure of justice, a court of equity permits a portion of the parties in interest to represent the entire body, and the decree binds all of them the same as if all were before the court." *Id.* at 302. *See* J. Moore 3B *Moore's Federal Practice* ¶ 23.11[2] (App.). *Smith v. Swormstedt* became the foundation for the "true" class action, where the right at issue was joint, common, or derivative on the part of all class members. *See id.* at ¶ 23.08 (App.). In such a suit, the judgment bound all non-party class members, despite the proscription of Equity Rule 48.

and never dealt with the Whitehead-Lupton Company. PX 64, 66, 69, 70, 73, 85. They are not parties to the 1921 Consent Decrees because they could not have been class members represented by the intervenors.

· The record contains the most recent Bottler's Contracts for the remaining Whitehead-Lupton bottlers, but those contracts were signed after the Consent Decrees were entered. As a consequence, it is unknown whether the following bottlers were either in existence at the time of the 1920 litigation, or are successors in interest to a Whitehead-Lupton first-line bottler: Coca-Cola Bottling Co. of Dickinson; Laredo Coca-Cola Bottling Co., Inc.; Las Cruces Coca-Cola Bottling Company; Coca-Cola Bottling Co. (San Angelo, TX); West Plains Coca-Cola Bottling Co.; Magnolia Coca-Cola Bottling Co., Inc.; Coca-Cola Bottling Co. (North Dakota); Marshall Coca-Cola Bottling Co.; Coca-Cola Bottling Co. of Kennett, a partnership; Coca-Cola Bottling Co. of Jamestown; Texas Coca-Cola Bot-

tling Co., Coca-Cola Bottling Co., Inc. (Alexandria, MN); Deming Coca-Cola Bottling Co.; Macon Coca-Cola Bottling Co. PX 65, 67, 68, 71, 72, 76, 77, 78, 81, 82, 84, 86. The status of these bottlers will presumably either be stipulated or ascertained at trial.

**11.** Equity Rule 48 states:

Where the parties on either side are very numerous, and cannot, without manifest inconvenience and oppressive delays in the suit, be all brought before it, the court in its discretion may dispense with making all of them parties, and may proceed in the suit, having sufficient parties before it to represent all the adverse interests of the plaintiffs and the defendants in the suit properly before it. But in such cases the decree shall be without prejudice to the rights and claims of all the absent parties.

*Reprinted in* Hopkins, *New Federal Equity Rules* at 52 (5th ed. 1925).

Equity Rule 38 dispensed with the earlier limitation on the effect of judgment in class suits. Further, the liberalized rule permitted the so-called "spurious" class action, in which class members are linked only by a common question of law or fact, and do not share a joint, common, or derivative right required for a true class action.[12] *See Gramling v. Maxwell*, 52 F.2d 256 (W.D.N. C.1931); Note, 30 Mich.L.Rev. 624 (1932) (discussing development of "spurious" class suits under Equity Rule 38). Equity Rule 38 does not, however, speak to the effect of a judgment on non-party class members, or distinguish between the "true" class action and the developing "spurious" class.

The question of a judgment's binding effect is important because if a person was not bound by a decree, then that person could not have been a member of the class, and hence, a party without having intervened. The "true" class action bound all members of the class under the Supreme Court's decision in *Supreme Tribe of Ben-Hur v. Cauble*, 255 U.S. 356, 366–67, 41 S.Ct. 338, 342, 65 L.Ed. 673 (1921). A "spurious" class action "does not bind those who are not parties." *Ayer v. Kemper*, 48 F.2d 11, 14 (2d Cir.), *cert. denied sub nom., Union Trust Co. v. Ayer*, 284 U.S. 639, 52 S.Ct. 20, 76 L.Ed. 543 (1931); *see Wabash Railroad v. Adelbert College*, 208 U.S. 38, 58, 28 S.Ct. 182, 189, 52 L.Ed. 379 (1908) (class members not joining earlier litigation not bound by that judgment).

The Whitehead-Lupton class intervention comes under the category of a "true" class action. The District Court premised its decision to permit a class action suit under Equity Rule 38 on the ground that "all persons having an interest in the subject of the action and in obtaining the relief de-

manded are now before the Court, seeking its aid in protecting the business, good will, and trade-mark rights, granted and conveyed by the contract of 1899 ... from violation by the [Company]." *The Coca-Cola Bottling Co. v. The Coca-Cola Co.*, 269 F. at 815. The Whitehead-Lupton bottlers operated under identical contracts, asserted the same right under the contract, and derived that right from a common source, the Whitehead-Lupton Company's original contract with the Company. The bottlers shared a common right under their contracts to receive Coca-Cola syrup and use the trademark.

As a "true" class action, the intervenors would adequately represent the interests of all other bottlers operating under identical contracts. The effect of a judgment, therefore, was binding on all Whitehead-Lupton bottlers, *Supreme Tribe of Ben-Hur v. Cauble, supra; Hartford Life Ins. Co. v. Ibs*, 237 U.S. 662, 672, 35 S.Ct. 692, 695, 59 L.Ed. 1165 (1915); *Smith v. Swormstedt*, 57 U.S. (16 How) at 303. *See Campbell v. Railroad Co.*, 4 F.Cas. 1178, 1181 (C.C.W. D.Tex.1871) (No. 2,366) (Bradley, J., Circuit Justice) ("where their right is the same and the number is so large as to render it difficult to bring them all before the court ... [suit] will be binding on all."). The non-intervening Whitehead-Lupton bottlers were parties to the 1921 litigation to the same extent as the intervenors, and therefore parties to the Consent Decrees under *Blue Chip*.

### ii. Thomas Bottlers

 Plaintiffs argue that the Thomas Company bottlers were also represented by the Whitehead-Lupton intervenors and thereby qualify as parties to the litigation and the 1921 Consent Decrees.[13] The fifth

---

**12.** The spurious class action came to fruition under the original Federal Rule of Civil Procedure 23(a)(2), permitting class treatment where "there is a common question of law or fact affecting the several rights and a common relief is sought." The rule was conceived as a form of permissive joinder, 3B J. Moore, *Moore's Federal Practice*, ¶ 23.10[1], and the judgment bound only named representatives and intervenors.

*Oppenheimer v. F.J. Young & Co., Inc.*, 144 F.2d 387, 390 (2d Cir.1944).

**13.** The Whitehead-Lupton intervenors signed the final decree in the Thomas Company case, *Coca-Cola Bottling Co. v. The Coca-Cola Co.*, C.A. No. 388 (D.Del.1921), in spite of not intervening in that case. PX 4. The intervenors were not a party in that litigation and therefore could not have represented the interests of the Thomas

paragraph of the contracts between the parents and first-line bottlers provides for different terms: the Thomas contracts were for two years, while the Whitehead-Lupton contracts "shall remain in full force and effect" as long as the bottlers fulfilled its requirements. Although the contracts were otherwise identical, the differing lengths of the contracts is a fundamental distinction between the two groups of bottlers. In addition to aligning themselves with their parent bottler, the Whitehead-Lupton intervenors also asserted a separate, independent basis to enforce their contracts against the Company.

■ In their brief to the Third Circuit Court of Appeals, the intervenors argued that the Company, by ratifying the bottler contracts, waived its right to terminate the contracts, and that the Company was estopped from asserting a right prejudicial to the bottlers. According to the bottlers, if the Company could cease supplying syrup to the parents, thereby terminating the bottlers' contracts, it "would render absolutely meaningless and ineffective the provisions of the Fifth paragraph of the subbottlers contracts, fixing the period of their duration ..." IV Record at 48. The Whitehead-Lupton bottlers premise their alternative argument on the perpetual nature of their contracts with the parent.

The majority of the Thomas bottlers' contracts had expired by the time the parties entered into the Consent Decrees. These bottlers had a substantially different position from the Whitehead-Lupton bottlers, because they could not assert a continuing right to receive performance beyond the two-year term of their contracts. 95 F.R.D. at 176. This distinction undermines

the commonality of interest required by Equity Rule 38 for class representation by the Whitehead-Lupton intervenors of the Thomas bottlers. The failure of any Thomas Company bottler to intervene in the parent bottler's suit prevents according party status to any of the Thomas bottlers.

■ Plaintiffs note that the Coca-Cola Bottlers Association appointed a Special Committee to protect the interests of all first-line bottlers. The Special Committee's eleven members included six Whitehead-Lupton and five Thomas bottlers, and funds for the legal fees were assessed to all bottlers. *Id.* The Special Committee hired the lawyer who represented the intervenors and approved the petition for intervention. PX 391; PX 425–26. Plaintiffs argue that the intervenors were controlled by the Bottlers Association, which in turn represented all bottlers, and therefore the Association was a party to the litigation and the Consent Decrees.

The argument ignores the central fact that individual Whitehead-Lupton bottlers and *not* the Association intervened in the original litigation.[14] The Bottlers Association's failure to intervene and become a party to the litigation prevents it from being the class representative to grant all first-line bottlers standing to enforce the Consent Decrees. *See Coke I,* 95 F.R.D. at 177.

To summarize, all unamended bottlers in this litigation from the former Whitehead-Lupton territory that were in existence or derived their existence from a member of the intervenor class have standing to enforce the Consent Decree to which they were a party.[15] Unamended bottlers from the former Thomas territory have no stand-

bottler class. The Court finds no significance in the Whitehead-Lupton bottlers having agreed to the entry of final judgment where they were not, and most likely would not have been participants in the suit.

**14.** The standing of associations to represent their members under Equity Rule 38 was accepted by the Courts. *Merchants & Manu. Traffic Assoc. v. United States,* 231 F. 292, 294 (N.D. Cal.1915) (3–judge district court) (no objection to class of persons similarly situated represent-

ed by association under the common name), *rev'd on other grounds,* 242 U.S. 178, 37 S.Ct. 24, 61 L.Ed. 233 (1916); *cf. International News Serv. v. Associated Press,* 248 U.S. 215, 233, 39 S.Ct. 68, 70, 63 L.Ed. 211 (1918) (corporate entity proper representative of affiliated members to protect their rights).

**15.** *See supra,* note 10, describing the status of first-line bottlers from the former Whitehead-Lupton territory.

ing to enforce the Consent Decree by reason of the intervention in the 1921 litigation. That does not end the matter because plaintiffs make additional arguments which they urge should confer standing to enforce the Consent Decrees. Those theories are predicated upon the substantive law of assignment and principles of *res judicata* and collateral estoppel.

### 2. Assignment
#### a. Nature of Consent Decrees

In *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975), the Supreme Court noted that "[c]onsent decrees and orders have attributes both of contracts and of judicial decrees...." *Id.* at 236 n. 10. Because of this dual character, "consent decrees are treated as contracts for some purposes but not for others." *Id.* This hybrid status is a result of the context in which consent decrees arise, as contracts signed in response to pending litigation that must be approved by the court. *Id.*

In *Blue Chip*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court stated that "a consent decree is not enforceable directly or in collateral proceeding by those who are not parties to it even though they were intended to be benefited by it." 421 U.S. at 750, 95 S.Ct. at 1932 (footnote omitted). This statement, if taken at face value, would seemingly preclude enforcement of any consent decree by a person who was not a direct participant in the litigation and the settlement of the case. *See, e.g., Coke I*, 95 F.R.D. at 175. Plaintiffs argue vigorously that the Supreme Court's position must not be construed as broadly as it appears, for two reasons. First, the question of non-party

enforcement of the consent decree in *Blue Chip* was at best tangential to the primary issue in the case, which was whether a private cause of action could be maintained under Rule 10b–5 when there was no purchase or sale of a security. Plaintiffs assert that the statement should be accorded minimal weight because it was neither a holding nor *dicta* in *Blue Chip*. Second, the cases cited by the Supreme Court as "well-settled authority" involved consent decrees in government antitrust cases. The *Blue Chip* limitation, argues plaintiffs, should be applied to antitrust consent decrees only.

This Court is bound by the Supreme Court statement of law and cannot distinguish *Blue Chip* statement on consent decrees on theoretical grounds not apparent in the case law. The important issue left open, however, is determining how broadly to interpret the term "party" for enforcement of a consent decree.[16]

Cases involving antitrust consent decrees have hewed closely to the *Blue Chip* rule barring any person not directly participating in the consent decree from suing to enforce its terms. *See National Union Electric Corp. v. Emerson Electric Co.*, 1981–2 Trade Cas. (CCH) ¶ 64,274 (N.D.Ill. 1981) (rejecting plaintiff's claim to third-party standing to enforce government antitrust consent decree even where decree for plaintiff's specific benefit; citing *Blue Chip*); *Cinema Serv. Corp. v. Twentieth Century-Fox*, 477 F.Supp. 174, 177–78 (W.D.Pa.1979) (barring claim for violation of government antitrust consent decree by private party). The rationale for strictly limiting standing to sue for violation of antitrust consent decrees was stated in a

---

**16.** The determination of who is a party to a consent decree must be distinguished from questions of intervention under Federal Rule of Civil Procedure 24. Under the Rule, a party may intervene as of right if "the disposition of the action may as a practical matter impair or impede his ability to protect [an] interest"; permissive intervention is within the court's discretion "when an applicant's claim or defense and the main action have a question of law or fact in common." As this Court stated in *Coke I,*

"... there is a fundamental difference between having the right to intervene in an ongoing action to protect interests which could be impaired by the resolution of that action, and bringing an action in the first instance to protect one's rights." 95 F.R.D. at 176. That a person *may* have had the right to intervene in prior litigation settled by a consent decree does not thereby make that person a party to the consent decree.

pre-*Blue Chip* decision: "To permit enforcement of an antitrust consent decree by third parties in reality makes the decree a statute continuing perhaps in perpetuity, and one withal not enacted by Congress." *Control Data Corp. v. IBM Corp.*, 306 F.Supp. 839, 846 (D.Minn.1969), *aff'd*, 430 F.2d 1277 (8th Cir.1970); *see Gautreaux v. Pierce*, 707 F.2d 265, 273 (7th Cir.1983) (antitrust consent decree creates enforceable rights in plaintiff only) (Posner, J., concurring).

The *Blue Chip* statement is not limited solely to government antitrust consent decrees, as that case was itself a suit for violation of the securities law. *Blue Chip* has also been held to bar nonparty standing to sue for violations of consent decrees between the Department of Energy and private parties under the Emergency Petroleum Allocation Act of 1973. *See Midwest Petroleum Co. v. U.S. Dept. of Energy*, 760 F.2d 287, 290 (Temp.Emer.Ct.App.1985) (citing *Blue Chip* ).

In cases involving consent decrees designed to proscribe future conduct, courts are more willing to allow persons who were not actual parties to the original litigation to sue for violations of the consent decree. In *Berger v. Heckler*, 771 F.2d 1556 (2d Cir.1985), the Secretary of Health and Human Services signed a consent decree concerning the proper interpretation of an eligibility section of the Social Security Act. In a subsequent contempt action, the Court of Appeals for the Second Circuit rejected the Secretary's argument that only those persons who were parties to the original suit can enforce the decree. *Id.* at 1566. The Circuit Court stated that the consent decree "confer[s] certain benefits on nonparties. It is clear to this court that, in so doing, [the Secretary] also agreed to the *enforcement* of the decree in favor of nonparties." *Id.* at 1567 (emphasis in original).

■ Consent decrees arising from suits asserting violations of the civil rights statutes have also been found amenable to subsequent third-party enforcement. *See Virgo v. Local Union 580*, 107 F.R.D. 84, 91 (S.D.N.Y.1985) (distinguishing *Blue Chip*; "As to consent decrees entered in civil rights cases, the weight of authority indicates that ... those whom the parties to a consent decree intended to be benefited thereby may enforce the decree in a separate action."). *Ennels v. Alabama Inns Associates*, 581 F.Supp. 708 (MD.Ala. 1984), involved a suit to enforce a consent decree barring a motel restaurant lounge from discriminating against black patrons. In rejecting defendant's argument that, under *Blue Chip*, only parties to the consent decree had standing to sue, the District Court allowed third-parties to sue because "[t]he *Ennels* decree itself leaves no doubt that its drafters intended it to benefit nonparties." [17] *Id.* at 710.

■ Although the analysis of nonparty standing in the antitrust and civil rights cases discussed above appears contradictory, the common fundamental principle applied by the courts is that the terms of the consent decree govern the scope of enforceability. *See United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) ("the scope of a consent decree must be discerned within its four corners."). The antitrust cases limit standing to actual parties to protect the private party from subjecting itself to perpetual liability to any unknown third person who its actions may have injured. *See Control Data Corp.*, 306 F.Supp. at 847 ("court does not read into the use of particular language an intent to confer a cause of action on any third party"). The civil rights consent decrees are remedial documents designed to protect the rights of a

---

**17.** Violation of a consent decree can form a valid claim of employment discrimination under 42 U.S.C. § 1981, if the plaintiff is a third-party beneficiary of the decree. The person need not have been a party to the consent decree if the decree was intended to cover the

person. *Jones v. Local 520, Inter. Union of Oper. Eng.*, 603 F.2d 664, 665 (7th Cir.1981), *on remand*, 524 F.Supp. 487, 490 (S.D.Ill.1981); *Virgo v. Local Union 580*, 107 F.R.D. 84, 91 (S.D.N.Y. 1985).

broader category of persons than the actual plaintiffs.[18] As such, the intent of the parties is to protect the rights of those who fall within the affected group. *See Ennels,* 581 F.Supp. at 710 (analyzing scope of decree prohibiting discrimination against "any other black person.").

The decisions interpreting the *Blue Chip* statement focus on the terms of the Consent Decree to discern the intent of the parties to permit a person not directly participating in the litigation to sue for a violation. This comports with the contractual nature of a consent decree. *United States v. ITT Continental Baking Co.,* 420 U.S. at 236 n. 10, 95 S.Ct. at 934 n. 10. The Court must review the terms of the 1921 Consent Decrees to ascertain whether any entities beyond the immediate parties in the 1920 litigation were intended to be parties to the Decrees' terms.

### b. *Assignment Under the Consent Decrees*

The 1921 Consent Decrees[19] make direct reference to the first-line bottlers in three places. In Paragraph 4, a notice requirement is set forth before a parent or first-line bottler can be found to have forfeited their contract rights, and limits the territorial scope of the forfeiture. In Paragraph 6, the parent bottlers agreed to fix the resale syrup price to their bottlers at $1.30 per gallon, with a price escalator available. Paragraph 15 states, "This settlement is conditioned upon the consent of the actual bottlers to the modification of their contracts with the [parent bottlers] in accordance with the terms of this agreement." The other paragraphs deal exclusively with the relationship between the Company and the parent bottlers.

In ascertaining the intent of the parties, it is significant that an arbitration clause, designed to govern disputes arising under the agreement, only empowers the named parties to request arbitration. The agreement is primarily between the Company and the parent bottlers, and the arbitration provision reflects their intent to limit the scope of the Decree.

The limited references to the first-line bottlers further demonstrates the Consent Decrees were not intended to directly benefit actual bottlers in and of themselves. The Decrees were conditioned on the bottlers' approval, but once approved the Consent Decrees govern directly the relationship between the Company and the parent bottlers, not the contracts between the parents and first-line bottlers.

The only clear expression of intent in the Consent Decrees to have other persons governed by the agreement appears in Paragraph 2: "The present contract ... shall apply to the parties hereto and their respective successors and *assigns;* but no assignment shall be made by the [parent bottlers] without the consent of the [Company]." (Emphasis added). The Decrees specifically empower a parent bottler to assign its rights under the agreement to third parties, with whom the Company would be bound to deal according to the terms of the Decree.

This analysis of the 1921 Consent Decrees establishes that the parties intended that only a limited group of nonparties be allowed to participate in the agreements: assignees of the parent bottlers. The issue of standing to enforce the Consent Decrees, therefore, depends on whether a nonparty first-line bottler can establish it is an assignee of the parent's rights under the

---

**18.** Whether the claim has been certified for treatment as a class action does not necessarily determine whether the parties intend the decree to be enforceable by third persons. In *Berger v. Heckler,* 771 F.2d 1556 (2d Cir.1985), the District Court determined that a class certification was unnecessary and untimely. The consent decree acknowledged that a class had not been certified, but the Circuit Court stated, "The absence

of class certification is not problematic in this case, and does not affect the enforceability ... of the decree itself." *Id.* at 1556. If one of the parties to the litigation is a class representative, then other class members would obviously be parties to a consent decree and have standing to enforce it.

**19.** The relevant text of the Consent Decrees is reprinted *supra,* note 2.

Decrees.[20] The defendant argues that its acquisition of the parent bottlers has extinguished all rights under the Consent Decrees to enforce their terms. The Company's intervening acquisitions of the parents, however, cannot affect the first-line bottlers' rights as assignees of the parents before the acquisitions took place. Where Bottler's Contracts were entered into before those acquisitions, the question of assignment will depend on the terms of those Bottler's Contracts.

### c. Scope of Assignment to First-Line Bottlers

Plaintiffs argue that the Bottler's Contract signed with the parents assigned them all of the parents' rights under the Consent Decrees.[21] "To make an effective

20. Seven plaintiffs signed contracts directly with the Company, and never dealt with a parent bottler. Six are from the former Whitehead-Lupton territory, *see supra* note 10, and one, Sacramento Coca-Cola Bottling Co., Inc., from the Thomas territory. PX 49. At oral argument, plaintiffs' counsel conceded these bottlers cannot be assignees of the parent bottlers' rights under the 1921 Consent Decrees. Transcript of Nov. 17, 1986, Oral Argument at 130.

21. The first-line Bottler's Contract is a form contract. The Whitehead-Lupton agreements were modifications of preexisting contracts, while the Thomas contracts were new ones that became operative after the expiration of the original two-year contract. *Coke I,* 95 F.R.D. at 173; *Coke II,* 98 F.R.D. at 260. Except for an additional provision in the Thomas contracts relating to the parent's and Company's reservation of right to fix the price of sugar in Paragraph FOURTH (d), *see infra,* note 23, the agreements are essentially identical. The applicable terms of the contract are:

#### BOTTLERS CONTRACT

THIS AGREEMENT, Made and entered into, on the ____ of ____ 19—— by and between Coca-Cola Bottling Co. (Thomas), Inc., a Corporation organized and existing under the laws of the State of Delaware, having its principal office, however, in the City of Chattanooga, Tenn., as party of the first part, and _____ _____ a _____ of the State of _____ _____ County of _____, and City of _____ as party of the second part:

#### WITNESSETH

That Whereas, party of the first part has received by approved transfer from The Coca-Cola Company certain rights and privileges in regard to the bottling and selling of bottled Coca-Cola; and

Whereas, party of the first part wishes to assign to party of the second part, on the conditions hereinafter stated, the rights that it has received by approved transfer from The Coca-Cola Company, limited, however, to the following described territory, to-wit:
\* \* \* \* \* \*

And Whereas, party of the second part is desirous of obtaining the right to bottle Coca-Cola in the territory hereinbefore described.

Now, Therefore, For and in consideration of mutual benefits and promises from one to the other, and other valuable consideration, the receipt of which is hereby acknowledged, It is Agreed:

FIRST: That the party of the first part hereby assigns to the party of the second part the sole and exclusive right and license that it received by approved transfer from The Coca-Cola Company, to use and vend on bottled Coca-Cola the trademark name Coca-Cola, and all labels and designs pertaining hereto, in connection with the product "Bottled Coca-Cola" in the territory hereinbefore described, and party of the first part agrees not to assign or transfer the right of usage of said name in said territory to any other party whatsoever; and said party of the first part agrees to obtain and furnish to party of the second part, and only to obtain, for the territory herein referred to, sufficient syrup for bottling purposes to meet the requirements of party of the second part in the territory herein described, provided, party of the first part can obtain the delivery to it of such syrup from The Coca-Cola Company under the contract existing between party of the first part and The Coca-Cola Company. . . .

SECOND: Party of the first part does hereby select party of the second part as its sole and exclusive customer and licensee for the purpose of bottling bottlers' Coca-Cola syrup, and using the name Coca-Cola thereon in the territory herein described.

THIRD: Party of the first part does hereby give to party of the second part a license to use the distinctive Coca-Cola bottle adopted, or that may be adopted, within the territory herein referred to, but said right shall end at such time as this contract is no longer in force or when it shall be terminated by the parties hereto or otherwise; provided, however, all conditions and terms of this contract are fully complied with by party of the second part.

FOURTH: In consideration of the above assignment of the rights above described in Paragraphs One, Two and Three and further, in consideration of the consent of the party of the first part to the use of the name Coca-Cola as a part of the corporate or business name of party of the second part, and its further consent to the use by party of the second part of

assignment of a contract right, the owner of that right must manifest his intention to make a present transfer of the right without further action by him or by the obligor." E. Farnsworth, *Contracts* § 11.3 at 754; *see Restatement (Second) of Contracts* § 317(1). The parties do not dispute that the Bottlers' Contract assigned some rights from the parents to the first-line bottlers, but they disagree over which rights under the Consent Decrees the contracts transferred. The Court must examine the terms of the contract to ascertain the intent of the parties.

 Plaintiffs point to the contract's second recital clause where it states, "Whereas, party of the first part wishes to assign to party of the second part, on the conditions hereinafter stated, *the rights it has received* by approved transfer from The Coca-Cola Company ..." (Emphasis

added). They argue the assignment is an unconditional transfer of all rights held by a parent, including rights granted under the Consent Decrees.

Standing alone, this clause appears to be an unlimited assignment. Viewing it in the context of the entire agreement, however, the parent bottlers intended to convey only those rights set forth in Paragraphs "FIRST," "SECOND" and "THIRD" of the contract. The quoted statement comes at the beginning of the contract, and forms part of a general recital of the parties' positions upon entering into the agreement. One rule of contract interpretation is that "Recitals are not a necessary part of a contract and can only be used to explain some apparent doubt with respect to the intended meaning of the operative or granting part of the instrument...." *Stabler v. Ramsay*, 30 Del.Ch. 439, 62 A.2d 464, 470

the trade-make Coca-Cola on the product so sold, party of the second part agrees:

\* \* \* \* \* \*

(d) To buy of or through said party all the Coca-Cola syrup required or used by said second party in the preparation for market of its bottled goods aforesaid, and to pay for said Coca-Cola syrup on the following scale of prices:

One Dollar and Thirty ($1.30) cents per gallon delivered to any point in the above described territory where a plant may be established by the party of the second part; and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance. The price of the syrup as here stated is to include five cents (5¢) per gallon for advertising matter to be furnished to the party of the second part at cost as the same is received by the party of the first part from The Coca-Cola Company. The market price of sugar on which the foregoing sliding scale is based, is to be determined quarterly, January, April, July and October of each year, by averaging the market price of standard granulated sugar during the first week in such quarter as quoted at the refineries by the ten refineries operating in the United States, having the largest capacity and output; but the ten refineries whose prices are to be used in obtaining the average price as herein stated and the fixing of that market price shall be as determined by the party of the first part and The Coca-Cola Company. If cash does not accompany the order for said syrup, then party of the first part is to have the right to

draw on party of the second part, with bill of lading attached, for the full purchase price.

\* \* \* \* \* \*

FIFTH: It is further agreed that so long as said party of the second part shall comply with the terms of this contract, the rights, privileges and immunities hereby assigned to aid second party shall remain in full force and effect,

\* \* \* \* \* \*

THIRTEEN: It is further agreed that all prior contracts, licenses and agreements between the parties hereto are ipso facto cancelled by the signing of this agreement

IN WITNESS WHEREOF, the parties have hereunto set their hands and sealed, IN DUPLICATE, the day and year first above written.

COCA–COLA BOTTLING CO. (THOMAS), Inc.

By _____
(Party of the First Part.) President

By _____
(Party of the Second Part.)

CONSENTED TO, but pursuant to, and not altering, amending or changing, the contract between The Coca-Cola Company and the Coca-Cola Bottling Company, of Chattanooga, Tennessee, which has been transferred to Coca-Cola Bottling Co. (Thomas), Inc.

THE COCA–COLA COMPANY,

By _____
Vice-President.

The Bottler's Contract of the Wilmington Coca-Cola Bottling Works dated July 11, 1931, is a Thomas Company agreement typical of the Bottler's Contract. PX 44.

(1948) (citations omitted); *see* 17 Am.Jur.2d *Contracts* § 268 (recitals "indicate only the background of a contract, they do not ordinarily form any part of the real agreement."). This rule is an application of the general principle of contractual interpretation: "[S]pecific terms and exact terms are given greater weight than general language." *Restatement (Second) of Contracts* § 203(c); *accord* 3 *Corbin on Contracts* § 547; E. Farnsworth, *Contracts*, § 7.11 at 497–98.

The first three substantive paragraphs of the contract present specifically the rights conveyed by the parent, *viz.* use of the Coca-Cola trademark, label and design, an exclusive license to bottle Coca-Cola, and the right to use the "distinctive bottle for Coca-Cola." This limited transfer of rights undermines the plaintiffs' position that the recital determines the scope of the assignment. The identical argument plaintiffs make came before the United States District Court for the District of Minnesota in *Coca-Cola Bottling Co. of Minnesota v. The Coca-Cola Co.*, 164 F.Supp. 293 (D.Minn.1957), where the court held, "The contention that [a parent bottler] granted to plaintiff [first-line bottler] certain rights which are broader than those to be found in the operative provisions of plaintiff's contract cannot be sustained." *Id.* at 302.

■ Plaintiffs next argue that the provision of an exclusive license in Paragraph SECOND of the Bottler's Contract is an assignment of the parents' rights under Paragraph 10 of the Consent Decrees. The contract provision makes the first-line bott-

ler the exclusive customer "for the purpose of bottling *Bottlers' Coca-Cola syrup,*" (within a given geographical area) while Paragraph 10 of the Consent Decree requires the Company to furnish the parents "high grade standard *Bottlers Coca-Cola Syrup,* [which] shall contain not less than five and thirty-two one-hundredths (5.32) pounds of sugar to each gallon of syrup." (Emphasis added). Plaintiffs' position is not entirely clear, but they seem to argue that because the identical term "Bottlers' Coca-Cola Syrup" is used in both documents, the parents intended to assign the first-line bottlers the right to enforce the sugar content provision of the Consent Decree.

■ Plaintiffs' argument fizzles out upon closer scrutiny. Although an assignment need not be memorialized in any particular form of words, *Restatement (Second) of Contracts* § 324, the bare fact of identical terms identifying the subject matter of the contract cannot manifest sufficiently the necessary intent for a valid assignment.[22] Moreover, plaintiffs point to no facts in the record, other than the terminological intersection, as evidence that the parents intended to convey all of their rights under the Consent Decrees.

■ Plaintiffs' final argument is that Paragraph FOURTH (d) of the Bottler's Contract, the syrup pricing provision, is drawn entirely from Paragraphs 6 and 7 of the Consent Decrees, and, therefore, this duplication effects an assignment of the parents rights.[23] As noted above, the fact

---

**22.** The present analysis of the term "Bottlers Coca-Cola Syrup" as used in Paragraph 10 of the Consent Decrees and in the Bottler's Contract must be distinguished from the Court's decision in *Coke III* interpreting the meaning of the word "sugar" in the 1921 Consent Decrees. Although there is insufficient evidence to support an assignment theory, the identity of language is relevant for the purpose of interpreting the Bottler's Contract to determine if there has been a breach. As the Court noted in certifying the class issues for trial in *Coke II:* "The nexus between the Consent Decrees and each unamended bottler's Bottler's Contract indicates that the interpretation of the Decrees will affect most, if not all, members of the putative class." 98 F.R.D. at 267. The analysis of assignment de-

pends on the intent of the parties as expressed in their agreement, while interpretation of contract terms involves the distinct issue of ascertaining meaning from the broad context of the transaction.

**23.** Paragraph FOURTH (d) of the Thomas Company standard Bottler's Contract contains the following clause which does not appear in the Whitehead-Lupton contracts: "... but the ten refineries whose prices are to be used in obtaining the average price as herein stated and the fixing of that market price shall be determined by the party of the first part [parent bottler] and The Coca-Cola Company." This clause is an express reservation of the right by the Thomas

of identical language, without more, does not manifest the necessary intent to demonstrate an assignment. Further, the introductory clause in Paragraph FOURTH states:

> FOURTH: In consideration of the above assignment of the rights above described in Paragraphs One, Two and Three and further, in consideration of the consent of the party of the first part to the use of the name Coca-Cola as a part of the corporate or business name of party of the second part, and its further consent to the use by party of the second part to the trade-mark Coca-Cola on the product so sold, party of the second part agrees: ....

The contract term tracking the pricing provisions of the Consent Decrees is grouped with other provisions detailing plaintiffs' *duties* under the contract, including the duty to purchase all syrup requirements at a price arrived at under the described formula. The provision's context demonstrates the parent did not intend to assign the bottlers its rights under the Consent Decrees' pricing provision, but rather to spell out the bottler's obligation.

The Bottler's Contract does assign certain specified rights under the Consent Decrees as enumerated in Paragraphs FIRST, SECOND and THIRD, relating to the trademark, exclusive license, and the distinctive bottle. That assignment does not implicate the parent's rights under the other paragraphs. Plaintiffs' standing to sue for breach of the Consent Decrees by the Company would be limited to rights arising under Paragraph 8 of the Decrees. *See supra,* note 2 (Consent Decree). Plaintiffs' complaint, however, only alleges a breach under Paragraphs 6, 7 and 10 of the Consent Decrees, which rights were not assigned by the parents. In the context of the present action, the first-line bottlers do not have standing under an assignment theory to bring their claim for relief for breach of the Consent Decree.

### 3. Res Judicata and Collateral Estoppel

Plaintiffs make a series of interrelated arguments under the doctrines of *res judicata* and collateral estoppel, that they assert grant standing to enforce the Consent Decrees.[24] Plaintiffs base their arguments on the modern developments in issue and claim preclusion begun in *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The question before the Court, however, is the bottlers' status vis-a-vis the 1921 Consent Decree. Recently developed nuances of *res judicata* and collateral estoppel doctrines cannot apply to determine who qualified as a party to litigation concluded 65 years ago.

An additional problem with plaintiffs' arguments relates to the preclusive effect of Consent Decrees in subsequent litigation. As in this litigation, a consent decree usually takes place when the case has been settled prior to a full examination of the contested issues. A prerequisite for collateral estoppel is that there has been a full and fair opportunity to litigate the claim. *Blonder-Tongue Lab., Inc. v. University of Ill. Foundation,* 402 U.S. at 329, 91 S.Ct. at 1443. In this case, the District Court in 1920 issued only a preliminary injunction against the Company pending "the final determination of said cause," I Record 129–30, and settlement came before the appeal could be heard. The issues were never fully and fairly litigated by the parties, and therefore

---

Company in conjunction with the Coca-Cola Company to fix the price of sugar, which forms the cost escalator in both the Consent Decrees and the contracts. The clause completely negates Thomas Company plaintiffs' argument that the parent assigned any rights under the Consent Decrees to participate in determining the cost of bottlers' syrup. The Whitehead-Lupton Bottler's Contract is not subject to the express reservation.

24. The arguments are: 1) privity between the first-line and parent bottlers at the time suit was filed; 2) actual representation of all bottlers by the intervenors; 3) virtual representation by the parent bottlers; 4) third-party beneficiary; 5) offensive collateral estoppel. The primary case plaintiffs rely on is *Montana v. United States,* 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

application of *res judicata* and collateral estoppel would be inappropriate. *See also* J. Moore, 1B *Moore's Federal Practice,* ¶ 0.444[3] (doubtful whether consent decree can be *res judicata* in subsequent litigation); J. Wright, A. Miller, & E. Cooper, 18 *Federal Practice & Procedure* § 4443 (collateral estoppel not applicable where parties settle pending appeal).

 The applicability of *res judicata* and collateral estoppel are more appropriate to the plaintiffs' individual claims against the Company for breach of contract. The doctrines are inapposite for determining the question of whether a first-line bottler has standing to enforce the Consent Decrees.

### C. Conclusion

Plaintiffs move for partial summary judgment under Federal Rule of Civil Procedure 56(d), which provides:

> **(d) Case Not Fully Adjudicated on Motion.** If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted....

"An order under Rule 56(d) narrows the issues, enables the parties to recognize more fully their rights and yet permits the court to retain full power to make one complete adjudication on all aspects of the case when the proper time arrives." *Woods v. Mertes,* 9 F.R.D. 318, 320 (D.Del. 1949).

Plaintiffs argue that the defendants have not submitted the requisite affidavits or supporting material denying plaintiffs' allegations, and, therefore, summary judgment should be granted. In *Wisniewski v. Johns-Manville Corp.,* —— F.2d —— (3d Cir. Jan. 30, 1987) (slip op.), the Third Circuit Court of Appeals considered a similar argument. The Circuit Court stated:

The Supreme Court rejected a virtually identical argument in *Celotex Corp. v. Catrett,* [——] U.S. [——], [——] ([106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)]) (reversing court of appeals' holding that defendant's "summary judgment motion was rendered 'fatally defective' by the fact that [defendant] 'made no effort to adduce *any* evidence, in the form of affidavits or otherwise, to support its motion.' "). The Court held that "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at [——], [106 S.Ct. at 2552–53]. *See also Anderson v. Liberty Lobby, Inc.,* [——] U.S. [——], [——], ( [106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) ] ); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* [475] U.S. [574], [——], ( [106 S.Ct. 1348, 1353, 89 L.Ed.2d 538 (1986) ] ). Although the Court acknowledged that a party seeking summary judgment must "inform[ ] the district court of the basis for its motion," it found "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex* [—— U.S.] at [——], [106 S.Ct. at 2553].

\* \* \* \* \* \*

Once [defendants] met their obligation to inform the district court of the basis for the motions, the claimants were required to establish the existence of genuine issues of material fact. *Celotex* at [——], [106 S.Ct. at 2553–54]; *Anderson* [—— U.S.] at [——], [106 S.Ct. at 2511]. On appeal they contend that they met this burden, and that summary judgment was therefore improper.

*Id.* at ——, —— (emphasis in original; footnote omitted). As in *Wiesniewski,* the record in this case is, at the very least, extensive, involving over 1000 exhibits and transcripts from 16 days of trial. The Court has before it the entire record of the

original 1920 litigation, and copies of all contracts between the first-line bottlers and the parents.

■■ Defendant opposes the motion on the basis that the record is inadequate. The Company notes that this Court stayed all discovery after *Coke II* on, *inter alia,* the standing question, and argues that the record is not complete, and bars granting summary judgment. DKt. 155. The Court has resolved the standing issue primarily as a matter of law. The minimal factual issues present, such as the terms of the Bottler's Contract and Shreveport's status in the 1921 litigation, are not disputed. The issues the Company identified as needing further factual development, such as the relationship of the individual bottlers to the Coca-Cola Bottlers Association, have been determined on a legal basis in favor of the Company. The record before the Court is more than adequate to permit decision on plaintiffs' motion.[25]

In light of the foregoing standing analysis, the following questions have been resolved, and an appropriate order will issue with respect to the following:

1. Shreveport has standing to enforce the terms of the Consent Decrees as an intervenor in the original litigation and party to the Consent Decree.

2. All unamended first-line bottlers contracting with the Whitehead-Lupton Company in existence at the time of the Consent Decrees, and their successors in interest to bottlers in existence at that time, who are intervenors in this case, have standing to enforce the terms of the Consent Decrees as members of the class represented by the intervenors in the original litigation.

3. Except insofar as an unamended first-line bottler has standing under Paragraphs One and Two above, plaintiffs do not have standing to enforce the terms of the Consent Decrees, except for rights granted under Paragraph 8, as assignees of the parent bottlers' rights under the Consent Decrees.

The Court takes no position in this Opinion on the effect the subsequent contracts entered into by the first-line bottlers and the parents, and the parties' course of performance under those contracts, will have in proving a breach of the Consent Decrees. Further, the analysis of the plaintiffs' standing to sue for breach of the Consent Decrees leaves unresolved the question of what relief, if any, is available to remedy the breach.

## III. RULE 54(b) CERTIFICATION—MOTION FOR ENTRY OF FINAL JUDGMENT [26]

The plaintiffs move the Court to enter the decision on the class issues severed for trial, *supra,* as a final judgment under Federal Rule of Civil Procedure 54(b). In light of the Court's refusal to amend or alter its conclusions on the meaning of "sugar" and "market price" in the 1921 Consent Decrees, the motion is ripe for consideration.

The Rule states:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that

---

**25.** Defendant also argues that the Order in *Coke II* certifying two questions for class treatment does not encompass the standing issue, and therefore plaintiffs impermissibly seek a decision on a class issue beyond the scope of that Order. *See* 98 F.R.D. at 268–69. Although plaintiffs seek to resolve the question for all unamended first-line bottlers before the Court, that does not automatically convert this into a class action claim. The factual and legal basis of the standing issue have been sufficiently developed and briefed to permit the Court to final-

ly resolve an issue it has held in abeyance for nearly four years.

**26.** Counsel stated at oral argument that the Rule 54(b) motion would not be appropriate if the Court denied the companion motion for partial summary judgment on the issue of plaintiffs' standing to sue for breach of the 1921 Consent Decrees. Transcript at 132–33. Because some first-line bottlers have standing under the Consent Decrees, the motion for entry of final judgment is properly before the Court.

there is no just reason for delay and upon an express direction for the entry of judgment....

Plaintiffs assert that the construction of the terms "sugar" and "market price" in the 1921 Consent Decrees is a final resolution of their claim for declaratory relief under 28 U.S.C. § 2201. The Court will first analyze the finality of *Coke III*, and then consider whether certifying a final judgment will advance judicial economy.

### A. *Finality*

■ Rule 54(b) is limited to cases involving multiple claims or multiple parties. The court can enter a final judgment pertaining to less than all the claims or parties only where a "complete disposition of the claim or of the rights and liabilities of the party" has been reached. 6 *Moore's Federal Practice* ¶ 54.30(1) at 54–164. "The District Court *cannot,* in the exercise of its discretion, treat as 'final' that which is not 'final' within the meaning of [28 U.S.C.] § 1291." *Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427, 437, 76 S.Ct. 895, 900, 100 L.Ed. 1297 (1956) (emphasis in original). In determining finality, the Court must look to practical considerations, *Gillespie v. U.S. Steel Corp.,* 379 U.S. 148, 152, 85 S.Ct. 308, 310, 13 L.Ed.2d 199 (1964) (citing cases), to ascertain whether a decision "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945).

In their complaint, plaintiffs request declaratory, injunctive, and monetary relief for alleged breaches of the 1921 Consent Decrees and the individual first-line Bottler's Contracts. They argue that the claim for declaratory relief under § 2201 is wholly separate from the requests for an injunction and compensation, even though there was a collective prayer for relief. Section 2201 permits a declaratory judgment action "whether or not further relief is or could be sought." Plaintiffs assert the decision is in the nature of a declaratory judgment, and therefore it is a final judgment for Rule 54(b) purposes.

■ In *Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976), the Supreme Court considered a Rule 54(b) entry of final judgment in a case involving a single claim. The Court stated,

> Had respondents sought *only* a declaratory judgment, and no other form of relief, we would of course have a different case. But even if we accept respondents' contention that the District Court order was a declaratory judgment on the issue of liability, it nonetheless left unresolved respondents' requests for an injunction, for compensatory and exemplary damages, and for attorneys' fees. It finally disposed of none of respondents' prayers for relief.

*Id.* at 742, 96 S.Ct. at 1206 (emphasis in original). Where substantial issues regarding relief remain unadjudicated, a Rule 54(b) certification is not appropriate. *See Rudd Const. Equipment Co., Inc. v. Home Ins. Co.,* 711 F.2d 54, 56 (6th Cir.1983) (partial summary judgment resolving one aspect of liability but not damages not a final judgment under § 1291 or for Rule 54(b)); *Nat. Corn Growers Assoc. v. Bergland,* 611 F.2d 730, 733 (8th Cir.1980) (per curiam) (declaration of rights not appealable order where claims for injunction and damages remain).

■ Even if the Court accepts plaintiffs' characterization of *Coke III* as a declaratory judgment, that judgment is so intimately related to their other claims for relief that it does not have the requisite finality for a Rule 54(b) certification. The findings on "sugar" and "market price" have not concluded the litigation on the 1921 Consent Decrees, but only set the definitional parameters within which plaintiffs must prove a breach by the Company. Even if there is a breach, serious unresolved issues remain on what relief, if any, is available. Any damage award or injunctive relief may be conditioned in part on the related breach of contract claims. The ultimate resolution of plaintiffs' claims awaits a complete examination of the relationship among the Company, the parents, and the bottlers.

■ Plaintiffs argue severance of the 1921 Consent Decrees issues for separate class adjudication controls the finality issue. "A separate trial may, of course, be granted as to a particular issue, where appropriate, even though it does not amount to a 'claim' or 'defense.'" 5 *Moore's Federal Practice* § 42.01[1] at 42–59. Severing the class questions was in "the interests of efficiency and economy of litigation," *Coke II,* 98 F.R.D. at 267, not to conclusively resolve one of the plaintiffs' claims. Separate class adjudication in and of itself does not confer finality.

### B. *Judicial Economy*

■ Assuming *arguendo,* the decision was a final judgment, certification under Rule 54(b) is within the Court's discretionary power. *Sears, Roebuck & Co. v. Mackey,* 351 U.S. at 437, 76 S.Ct. at 900. The Rule requires that the Court find "no just reason for delay" before it may enter a final judgment.

The Supreme Court discussed the factors to be considered in granting a Rule 54(b) motion in *Curtiss-Wright Corp. v. General Electric Co.,* 446 U.S. 1, 8, 100 S.Ct. 1460, 1465, 64 L.Ed.2d 1 (1980):

> ... whether the claims under review were separable from the others remaining to be adjudicated and whether the nature of the claims already determined was such that no appellate court would have to decide the same issues more than once even if there were subsequent appeals.

*Cf. Cold Metal Process Co. v. United Co.,* 351 U.S. 445, 452, 76 S.Ct. 904, 908, 100 L.Ed. 1311 (1956) (relationship of adjudicated and unadjudicated claims is one factor for District Court to consider). The Court must balance these factors to determine whether it would be more economical to permit piecemeal appeal as an aid to ultimately concluding this already laborious litigation. *See U.S. Golf Assoc. v. St. Andrews Systems,* 749 F.2d 1028, 1031 n. 5 (3d Cir.1984).

The complaint alleges breach of the bottlers' individual contracts and the Consent Decrees. The meaning of the contract terms are derived, in part, from the Consent Decrees. *Coke II,* 98 F.R.D. at 266. Plaintiffs argue that severance of the 1921 Consent Decree issues for class determination is persuasive evidence that it would further judicial economy to permit an immediate appeal of that decision. Plaintiffs misconstrue the rationale for that Order. Ascertaining the meaning of "sugar" and "market price" is the first step, but proof of breach, damages and the propriety of injunctive relief must await further trial. *Coke III* resolved a common component of plaintiffs' separate claims, but construction of the 1921 Consent Decrees is not a distinct issue. Properly understood, the decision provides the threshold guidelines applicable to the diverse claims for relief.

The principle of judicial economy would not be served by permitting piecemeal review. The decision on the meaning of "market price" in Paragraph 7 and "sugar" in Paragraph 10 may be irrelevant if the bottlers are unable to prove breach of the contracts or Consent Decrees. Further, important questions on course of performance, governed by the different state laws that apply to the individual bottler contracts, will affect the ultimate application of the Court's definition of the Consent Decrees terms in a particular case. An immediate appeal will not obviate subsequent appeals, and may well be a fruitless exercise.

The plaintiffs also argue that a Rule 54(b) certification would aid in the resolution of the related *Diet Coke* litigation, *Coca-Cola Bottling Co. of Shreveport v. The Coca-Cola Co.,* Civ. A. No. 83–95 MMS (D.Del.), and *Alexandria Coca-Cola Bottling Co., Ltd. v. The Coca-Cola Co.,* Civ. A. No. 83–120 MMS (D.Del.), which also involves the 1921 Consent Decrees. Although *Coke* and *Diet Coke* are connected, that fact does not weigh in favor of entering a final judgment in *Coke III.* "[Rule] 54(b) orders should not be entered routinely or as a courtesy or accommodation to counsel." *Panichella v. Penn. Railroad Co.,* 252 F.2d 452, 455 (3d Cir.1958).

The Court finds that an immediate appeal would hinder the orderly processing of this litigation. An order will be entered denying plaintiffs' motion for entry of final judgment under Rule 54(b).